ALBERTO FLORES RAMÍREZ, demandante y recurrido, *v.* DR. JOSÉ MALDONADO ET ALS., demandados y recurrentes.

Número: RE-90-146          Resuelto: 27 de junio de 1995

*Miguel Limeres Grau*, de *Parra, Del Valle, Frau & Limeres*, abogado de los recurrentes; *Luis E. Laguna Mimoso*, abogado de los recurridos.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ DENTON emitió la opinión del Tribunal.

El Dr. José Maldonado, Yauco Primary Care y la Asociación de Servicios Médico-Hospitalarios de Yauco nos solicitan que revisemos una sentencia del Tribunal Superior, Sala de Ponce, que concluyó que la muerte de la menor Michelle Flores Romero fue causada por la negligencia con-

currente de sus padres y el médico codemandado. Los peticionarios sostienen que ellos no incurrieron en negligencia ni en impericia profesional al atender y tratar a la menor en la sala de emergencia del Hospital Tito Mattei de Yauco (en adelante el Hospital). Evaluado el recurso a la luz de la prueba presentada en el foro de instancia, confirmamos el dictamen recurrido en cuanto a que el Dr. José Maldonado y el Hospital incurrieron en impericia médica al no "practicarle [a la menor] un examen más amplio y ofrecerle un tratamiento más adecuado y eficaz, atendiendo mayormente el aspecto de la deshidratación que la paciente demostraba". Sentencia, pág. 4.

## I

La exposición narrativa de la prueba revela con claridad la odisea que sufrió la familia Flores Romero y que culminó en la trágica muerte de su hija de cinco (5) años de edad, Michelle Flores Romero. Ésta establece que el 16 de diciembre de 1984 Michelle y Jason Flores Romero, hijos de los demandantes Alberto Flores Ramírez y Dorka Romero Cruz, amanecieron muy enfermos. Aunque ambos se despertaron con fiebre, Michelle se levantó particularmente decaída y con vómitos. Preocupado por la condición de ambos, su padre los llevó al Centro de Salud de Guánica. Allí les tomaron la temperatura a los niños y al comprobar que la de Michelle era extremadamente alta la refirieron al Hospital.

Una vez llegaron a la sala de emergencia del Hospital, tuvieron que esperar alrededor de dos (2) horas para ser atendidos por personal médico. A pesar de que la niña vomitó en varias ocasiones mientras aguardaba en la sala de espera, el personal paramédico no accedió a las peticiones de Flores para que atendieran pronto a Michelle.

Según declaró el padre en el juicio, él le había informado al doctor Maldonado —antes de que éste procediera a exa-

minar a su hija— que "ella había amanecido con fiebre, devolviendo y deca[í]da". E.N.P., pág. 10. Además, "le indicó ... que la [niña] estaba demasiado deca[í]da" (íd., pág. 11), a lo que el médico respondió que "ello se debía a la fiebre. ... que le diera ... los medicamentos, que descansara, que al otro día iba a amanecer bien". Íd. Acto seguido, el doctor Maldonado le recetó antibióticos y la dio de alta sin instruir al padre sobre la atención y el cuidado que debía observar en la casa.

Una vez llegaron a su hogar, los padres de la niña le suministraron la primera dosis del antibiótico y la acostaron. La menor descansó toda la tarde pero su condición no mejoró. Según el padre, ella intentó vomitar varias veces pero no pudo hacerlo. Finalmente, tanto los padres como los niños se acostaron a dormir.

Como a las 2:00 A.M., al escuchar unos sonidos raros provenientes de la habitación de los niños, la señora Romero se levantó y encontró a Michelle quejándose y respirando con mucha dificultad. En vista de los problemas que aquejaban a la menor, el padre acudió, con la niña en sus hombros, a la residencia de un vecino para que éste le facilitara un carro para llevarla al Hospital. En esos instantes "la niña se vomitó encima de él, devolviendo un líquido color brown". E.N.P., pág. 12. El padre narró que la niña no respondió por el camino y al llegar al Hospital una doctora que la atendió le indicó que Michelle había fallecido.

Por su parte, el perito de los demandantes, Dr. Juan E. Santiago, declaró que del expediente médico se desprendía con claridad que Michelle había llegado al Hospital, proveniente del Centro de Salud de Guánica, "agudamente enferma, con fiebre alta (39.5 grados) y vómitos" (E.N.P., pág. 1) y que no fue hasta dos (2) horas más tarde cuando la menor fue atendida, examinada y, cinco (5) minutos despúes, dada de alta.

El perito médico indicó, además, que en la sala de emergencia la enfermera de turno anotó que Michelle tenía los

labios resecos y la temperatura alta. Señaló que esto era una indicación de que la niña se estaba deshidratando y "que con un cuadro de vómitos y temperatura alta, la misión era eliminar los vómitos, bajar la fiebre y buscar la causa". E.N.P., pág. 6. Sin embargo, explicó que del expediente del Hospital no se desprendía que le hubiesen tomado los signos vitales ni que se le hubiera hecho un examen de sangre para determinar su contaje y el nivel de electrolitos que indicara la situación de las sales en la sangre, lo cual resulta necesario "pues un paciente con fiebre y vómitos pierde las sales y [ello] puede conllevar la p[é]rdida ... de la tonalidad muscular". Íd., pág. 3.

Según el perito, una vez el doctor Maldonado diagnosticó que la niña tenía "tonsilitis aguda, con [fiebre] alta y [síntomas de] deshidratación, [lo que procedía era] poner[le] ... suero y antibiótico intravenoso o intramuscular, pues por la vía oral vom[itaba]". E.N.P., pág. 4. Sin embargo, no se le suministró antibiótico intravenoso y se la dio de alta únicamente con instrucciones de que comprara un antibiótico oral. De acuerdo con el perito, el antibiótico oral recetado no era el indicado porque éste irrita el estómago y produce vómitos.

Éste también se sorprendió de que la niña fuera dada de alta a los cinco (5) minutos de ser atendida y que anotaran en el expediente médico que la niña estaba estable. Señaló que los medicamentos suministrados para contrarrestar los vómitos y reducir la fiebre tardan aproximadamente quince (15) minutos en dar resultado y que por lo menos debieron esperar ese tiempo para verificar si Michelle respondía a los medicamentos y mejoraba.

A la luz del informe del patólogo, el perito concluyó que la niña había muerto de una broncoaspiración. Explicó que "la broncoaspiración se da en personas débiles, ya [sea] por [tratarse de una] enfermedad en progreso, por haber convulsado o por desórdenes electrolíticos". E.N.P., pág. 5. Señaló, además, que esto sucede cuando el paciente está muy

débil y deshidratado y "el líquido estomacal no se expulsa totalmente afuera y se va por los bronquios y ... causa asfixia por aspiración". Íd., pág. 4. En este caso, la menor "estaba débil por no atenderse a tiempo, no recibir el medicamento adecuado y no corregirle la deshidratación [y] ... siguió empeorando hasta que murió por la aspiración de uno de sus vómitos".

Finalmente, el perito testificó que el hecho de que el líquido que vomitó antes de su muerte fuera color marrón "era indicio de sangramiento por las paredes gástricas, cosa que ocurre cuando el paciente está severamente enfermo debido a los vómitos cont[i]nuos, a toxicidad y al 'stress' nuevo del paciente". E.N.P., pág. 4.

Por su parte, el Dr. José Maldonado, quien atendió a Michelle Flores en la Sala de Emergencia del Hospital, declaró que le examinó los oídos, la nariz, la garganta y los ojos. En el examen encontró sus amígdalas engrandecidas y enrojecidas y notó que Michelle tenía la temperatura alta. E.N.P., pág. 17. Basándose en estos exámenes y en la información ofrecida por los padres de que la niña había estado vomitando, diagnosticó una tonsilitis. Ante este cuadro clínico agudo le administró aspirina en supositorios para bajarle la fiebre y "Tigán" para el control de los vómitos. Además, le recetó ampicilina por la vía oral, que debía tomarse en su hogar cada seis (6) horas junto con "Tylenol". Íd., págs. 17–19.

El doctor Maldonado señaló que aunque tenía antibióticos para inyectarla de forma intravenosa, no entendió que era necesario hospitalizarla ni suministrarle ese medicamento. Más aún, "[a]l pregunt[arle] si la práctica correcta [era] esperar y observar los efectos de la medicina en el paciente, contestó que no esta[ba] establecido en ningún texto que por una condición como la de la niña [hubiera] que admitirla o retenerla en un hospital". E.N.P., pág. 19. Tampoco creyó necesario requerirle prueba de sangre ni de orina ni un examen de electrolitos. El doctor sos-

tuvo que del expediente no surgía que Michelle tuviera problemas de deshidratación. Expuso que "no necesariamente [constituía] un caso de deshidratación uno de labios resecos unido a un historial de vómitos". Íd., pág. 20. Finalmente, el doctor Maldonado declaró que las únicas instrucciones que le impartió al padre "fue que no se preocupara, que comenzara con los antibióticos y que siguiera con esas medicinas". Íd., pág. 20.

Por la parte demandada también testificó el Dr. Silvio Vélez Estrada, quien declaró que el tratamiento brindado a la paciente fue adecuado y que la sintomatología de la niña era compatible con el diagnóstico de tonsilitis aguda. Además, expuso que los medicamentos ordenados eran los indicados para la enfermedad y cumplían con las exigencias de la Medicina. Informó que "un paciente de 6 años de edad, con vómitos, fiebre, labios secos y tonsilitis aguda [podía] tener deshidratación leve[; que] el tratamiento consiste en eliminar la causa por la cual se ha deshidratado e hidratar al paciente, de manera que la ingestión del líquido sea mayor que la pérdida que tenga[, y que] el tratamiento puede ser ambulatorio, más inclinado a lo oral, fuera del hospital." E.N.P., pág. 22.

En el contrainterrogatorio, el doctor Vélez Estrada admitió que al dar de alta a la niña, las instrucciones al padre fueron insuficientes. Señaló que él hubiese instruido al padre de que si persistía la fiebre o los vómitos o si cambiaba el cuadro clínico debía comunicarse con el Hospital. No obstante, indicó que aunque se cometió un error en las instrucciones, éste había sido de juicio y no se había incurrido en negligencia. E.N.P., pág. 25.

Recibida toda la prueba documental y testifical, el Tribunal Superior concluyó que el doctor Maldonado incurrió en negligencia "al atender y tratar a la niñita Michelle Flores Romero en la forma en que lo hizo conforme a la prueba creída por el Tribunal". Sentencia, pág. 4. Sostuvo que ante el cuadro crítico de la niña, el médico debió ha-

berle dedicado más tiempo que los meros minutos que le prestó para así "poder ampliar el historial de[l] caso, practicarle un examen más amplio y ofrecerle un tratamiento más adecuado y eficaz, atendiendo mayormente el problema de deshidratación que la paciente demostraba". Íd.

El foro de instancia concluyó que "en lugar de [dar] de alta [a la paciente], debió retenérse[le] en la sala de emergencia para observar su condición y su reacción a los medicamentos administrados y para someterla también a un tratamiento de hidratación". Sentencia, pág. 4. Además, señaló que un paciente en las condiciones de la niña, con un historial de vómitos recurrentes, no iba a tolerar los antibióticos por la vía oral, "por lo que era de rigor ordenar su administración por la vía intravenosa e intramuscular." Íd.

Por otro lado, el tribunal a quo determinó que el doctor Maldonado debió haber instruido y orientado al padre de la menor sobre las reacciones posibles a los distintos medicamentos y con instrucciones específicas de devolverla al Hospital en caso de que no respondiera al tratamiento. Por último, concluyó que los padres fueron también negligentes cuando no regresaron al Hospital ante la recurrencia de "las arqueadas de la niña" y al dejarla sola mientras dormía.

Dadas estas circunstancias, el Tribunal Superior determinó que la muerte de la niña se había debido tanto a la negligencia del doctor Maldonado como a la de los padres, y procedió a estimar en un sesenta por ciento (60%) la del médico y un cuarenta por ciento (40%) la de sus progenitores. Por lo tanto, condenó a la parte demandada a pagar solidariamente la suma de sesenta mil dólares ($60,000) por concepto de daños y perjuicios, novecientos dólares ($900) por concepto de los gastos especiales y dos mil dólares ($2,000) en honorarios de abogado.

De esta sentencia, los demandados recurrieron ante nos y han señalado que el Tribunal Superior cometió un error

manifiesto al aquilatar de forma arbitraria la prueba presentada. Oportunamente expedimos el recurso y ordenamos la preparación de una exposición narrativa de la prueba.

## II

■    Entre los servicios más importantes que proveen los hospitales en nuestra comunidad se encuentran las facilidades para atender las emergencias médicas. Véase S.M. Lewis, *Emergency Medical Malpractice*, Nueva York, Ed. Willey & Sons, 1987, sec. 1.1, págs. 1–2. Estos servicios de emergencia médica se distinguen precisamente porque consisten en los primeros auxilios que deben ofrecerse, en un breve período de tiempo, a una persona que tema que su vida o estado de salud está en peligro. Véase B.J. Ficarra, *The Emergency Room and the Law*, 12 Cal. W.L. Rev. 223, 239 (1976). Al ofrecer el servicio, se supone que el personal médico determine primero si el paciente tiene una emergencia médica y, de concluir que sí, suministre el tratamiento que sea necesario para estabilizar su estado de salud y lo prepare para referirlo para un cuidado adicional en otro lugar.

It is a time-dependent process of initial recognition of an emergency situation and the stabilization, evaluation, treatment and disposition of the patient. The application of resuscitative techniques and other interventions is necessary to stabilize the patient in preparation for further care and continues until patient disposition is complete. The physician must evaluate priorities, select among myriad choices and initiate intervention that may involve many body systems at the same time that he is faced with competing patient needs, time constraints and limited diagnostic information.

Intervention usually occurs in the absence of an established patient-physician relationship and often the patient and family are in a state of anxiety and impatience. Because of these patient care challenges, the emergency physician must possess skills in clinical judgement, team leadership and stress/crisis management. 1 *Goldsmith's Medical Malpractice: Guide to Me-*

*dical Issues, Guide to Malpractice Issues* Sec. 3.03[4], pág. 3-11 (1995).

Por la importancia de estos servicios, tanto el Congreso de Estados Unidos como las asambleas legislativas de muchos estados han aprobado leyes que reglamentan las facilidades de emergencia y les imponen el deber de proveer los primeros auxilios a personas gravemente enfermas o seriamente heridas. Véase M.A. Mancini y A.T. Gale, *Emergency Care and the Law*, Maryland, Ed. Aspen Co., 1981, págs. 49–52. En Puerto Rico, recientemente se aprobó la Ley Núm. 35 de 28 de junio de 1994 (24 L.P.R.A. sec. 3111 *et seq.*), la cual dispone que los hospitales tienen que suministrar el tratamiento necesario a todos los pacientes que acudan a sus facilidades con una emergencia médica. Esta ley requiere que se haga "una evaluación médica adecuada a fines de determinar si existe una condición de emergencia médica". Art. 2 de la Ley Núm. 35, *supra*, 24 L.P.R.A. sec. 3112. Si se concluye que hay una emergencia médica o un parto en progreso, el hospital deberá proveerle al paciente "el tratamiento necesario para estabilizar dicha condición, o asistirle en el parto, según sea el caso, o proveerle para que sea trasladado a otra institución médica ... para prestarle el tratamiento adecuado" —Art. 2, *supra*— independientemente de su capacidad de pago. Dicha ley está basada en la ley federal conocida como "Anti-Dumping Act", Public L. No. 99–272, Title IX, Sec. 912(b), 100 Stat. 164 (1985).

Aunque la Ley Núm. 35, *supra*, no había sido aprobada cuando ocurrieron los hechos que originan la acción de autos, el estatuto federal estaba en vigor y aplicaba a Puerto Rico. Para esa fecha también aplicaba el Reglamento del Secretario de Salud Núm. 56, que requería como condición para el otorgamiento de un certificado de necesidad y conveniencia que toda facilidad hospitalaria estableciera un servicio de sala de emergencia "que cubra las necesidades de la población". (Énfasis suplido.) Reglamento

del Departamento de Salud para la Operación y Funcionamiento de las Facilidades de Salud en Puerto Rico de 11 de junio de 1985, Cap. X, pág. 60.

Por otro lado, ya para entonces, este Tribunal se había expresado en torno a este asunto al requerir que en las salas de emergencia se ofreciera un tratamiento que —a la luz de los modernos medios de comunicación y enseñanza, y conforme con el estado de conocimiento de la ciencia y la práctica prevaleciente de la Medicina— satisfaga las exigencias reconocidas generalmente por la profesión.[1] *Pérez Cruz v. Hosp. La Concepción*, 115 D.P.R. 721, 729 (1984).

Nuestros estándares en torno al tratamiento que debe requerirse en las salas de emergencia son muy similares a los que han sido adoptados en Estados Unidos. Allí se ha dispuesto que:

> The liability of the hospital or emergency department physician is determined by reference to the standards of other health care providers in the same locality, in similar localities, or on a national basis. The modern trend is to compare the conduct of the doctor or hospital with the standard of care aplicable to doctors or hospitals nationally. Lewis, *op. cit.*, sec. 2.9, pág. 35.

La doctrina mayoritaria en Estados Unidos, según reconocida por la legislación federal y estatal y por las normas de las entidades acreditadoras, ha sido clara al imponerle a los hospitales y a los médicos el deber de ofrecer el tratamiento necesario para estabilizar al paciente lo más posible antes de transferirlo a otro lugar o darlo de alta. Tam-

---

[1] Debemos recordar que, de ordinario, un error de juicio honesto y razonable en el diagnóstico y tratamiento del paciente exime de responsabilidad profesional cuando las autoridades médicas no estén de acuerdo sobre cuál es el remedio requerido para curar la enfermedad. Como en todo caso de impericia médica, se presume que se ejercitó un cuidado razonable en el tratamiento; le corresponde al demandante establecer, mediante prueba pericial, que la actuación del demandado no cumple con las normas profesionales. Véanse: *Rodríguez Crespo v. Hernández*, 121 D.P.R. 639 (1988); *Medina Santiago v. Vélez*, 120 D.P.R. 380, 386 (1988); *Pérez Torres v. Bladuell Ramos*, 120 D.P.R. 295 (1988); *Ríos Ruiz v. Mark*, 119 D.P.R. 816, 820 (1987); *Pérez Cruz v. Hosp. La Concepción*, 115 D.P.R. 721, 729 (1984).

bién les ha requerido coordinar la transferencia del paciente a otra área del mismo hospital o, a falta de las facilidades necesarias, a otra institución que pueda prestarle el tratamiento adecuado hasta que se recupere.

■ Según dicha doctrina, no es hasta que se estabilice la condición de emergencia médica del paciente, y resulte razonable concluir que éste no requiere tratamiento adicional, que éste puede ser dado de alta de la sala de emergencia. Cuando esto ocurre se le debe proveer instrucciones claras sobre las atenciones que debe recibir en su hogar y las circunstancias que se requieren para que regrese a la sala de emergencia para algún tratamiento adicional.

> A patient should only be discharged when it is medically warranted and can be done safely. ... Follow-up instructions must be clear and unambiguous and should include instructions for return to the emergency department for treatment if that is indicated. Lewis, *op. cit.*, sec. 2.30, pág. 78.

■ Al amparo de esta normativa, el incumplimiento con estos estándares de cuidado ha sido razón suficiente para imponerle responsabilidad a aquellos hospitales y médicos que negligentemente hayan dado de alta a un paciente o lo hayan transferido indebidamente a otra facilidad. Véase Mancini y Gale, *op. cit.*, pág. 138.

Examinada la normativa aplicable a los casos de impericia médica que ocurren en las salas de emergencia, analicemos la controversia ante nuestra consideración.

## III

En el caso de autos, la parte demandante cumplió con su obligación de presentar prueba que demostrara que el tratamiento brindado por el doctor Maldonado fue negligente. Coincidimos con el perito de la parte demandante en que ante el hecho de que, según el expediente

médico, la niña fue llevada a la sala de emergencia "agudamente enferma, con fiebre alta (39.5 grados[C]) y vómitos" (E.N.P., pág. 1), era necesario que se le hiciera un examen de sangre para determinar su contaje y el nivel de electrolitos. Si tomamos en consideración la edad de Michelle y la facilidad con que un niño se deshidrata, es realmente sorprendente que el personal médico en la sala de emergencia del Hospital ignorara por completo la posibilidad de que la niña se estuviera deshidratando. Todo el que haya tenido niños o haya estado en contacto con ellos sabe que éstos, por su tamaño y por su volumen de líquido, se pueden deshidratar en pocos minutos. El historial de vómitos de Michelle en combinación con los labios secos y la fiebre alta que tenía requerían que el personal médico que la atendió le hiciera los exámenes pertinentes para determinar si, en efecto, se estaba deshidratando y para averiguar la magnitud de la infección.

■ Coincidimos también con la prueba pericial de la parte demandante en cuanto a que una vez se le diagnosticó tonsilitis aguda con síntomas de fiebre alta y posible deshidratación procedía ponerle suero y antibióticos de forma intravenosa para evitar que los vomitara. La práctica prevaleciente en la Medicina así lo requiere. Además, cualquier persona razonable sabe que cuando uno ha perdido mucho líquido se puede deshidratar y que para recuperarse hay que suplir dichos líquidos. Esto de ordinario se hace mediante la administración cuidadosa de suero intravenoso con un seguimiento a través de monitores. Véase Lewis, *op. cit.*, pág. 337.

Además, contrario a las normas de cuidado mínimo prevalecientes en las salas de emergencia, en el caso de autos el doctor Maldonado dio de alta a la menor sin ni siquiera advertirle a los padres que tenían que darle líquidos para hidratarla y sin apercibirles de los síntomas a los que tenían que estar pendientes para evitar una complicación. El propio perito de la parte demandada aceptó que las ins-

trucciones que se le brindaron al padre eran claramente insuficientes. En su testimonio, dicho perito señaló que él hubiese instruido al padre sobre las complicaciones que podían afectar la recuperación de la niña y que tenía que llevarla al Hospital si persistía la fiebre o los vómitos.

Por otro lado, el informe del patólogo reveló que Michelle murió por una "broncoaspiración de contenido gástrico". El perito de los demandantes testificó que esto ocurre cuando un paciente se debilita por una infección acompañada con vómitos. Explicó que "la broncoaspiración se da en personas débiles, ya sea por su enfermedad en progreso, por haber convulsado o por desórdenes electrolíticos". E.N.P., pág. 5. Cuando esto ocurre, el paciente se debilita tanto que no puede expulsar todo el líquido que tiene en el estómago y éste se va a los bronquios, causando una asfixia por aspiración.

Del análisis anterior se desprende con claridad que el tratamiento utilizado para controlar los vómitos y la aspiración del líquido gástrico, en combinación con las instrucciones tan deficientes que se le brindaron a los padres en el manejo de la enfermedad en el hogar, fueron en gran parte responsables por la muerte de Michelle.

Los padres, por su parte, también fueron responsables. Ante la enfermedad de su hija y su continuo debilitamiento después de salir del Hospital, debieron haber regresado antes a la sala de emergencia. Ellos, sin embargo, han aceptado el grado de responsabilidad por la muerte de su hija que impuso el dictamen recurrido.

Por lo tanto, corresponde al Hospital y al doctor Maldonado aceptar su responsabilidad por esta desgracia. Si consideramos el extraordinario desarrollo de la Medicina en Puerto Rico en las últimas décadas, la muerte de esta niña hubiera podido evitarse si ellos hubiesen ofrecido el tratamiento que requería la emergencia médica de Michelle. *Procede confirmar el dictamen recurrido.*

*Se dictará la sentencia correspondiente.*

El Juez Asociado Señor Negrón García emitió una opinión de conformidad. El Juez Presidente Señor Andréu García emitió una opinión disidente, a la cual se unió el Juez Asociado Señor Alonso Alonso. El Juez Asociado Señor Rebollo López emitió una opinión disidente.

— O —

Opinión de conformidad del Juez Asociado Señor Negrón García.

Ante el trasfondo fáctico que revela este drama, suscribimos la decisión para confirmar la imposición de responsabilidad legal al Dr. José Maldonado Vázquez *et al.* Expongamos suscintamente los hechos.

I

El 16 de diciembre de 1984, aproximadamente a las 9:30 A.M., la menor de cinco (5) años Michelle Flores Romero fue llevada por su padre Alberto Flores Ramírez al Centro de Salud del Municipio de Guánica con síntomas de fiebre (38.5 grados centígrados) y *vómitos*. De allí fue referida al Hospital de Área de Yauco, Dr. Tito Mattei (en adelante Hospital). Mientras esperaba atención médica en la Sala de Emergencia de esa institución, Michelle vomitó *varias* veces más, tenía los labios resecos y la temperatura le subió a 39.5 grados centígrados. Después de una (1) hora de haber llegado al Hospital, fue atendida por el médico de guardia, doctor Maldonado Vázquez, quien, tras un somero examen que no duró más de cinco (5) minutos, diagnosticó *tonsilitis aguda* (amigdalitis). Nadie le tomó los signos vitales de respiración, presión sanguínea o pulso. El doctor Maldonado Vázquez ordenó, y se le administró, *Tigán* para los vómitos y un supositorio de aspirina. La dio de alta con

instrucciones a su padre de adquirir y administrarle *oralmente* el antibiótico *Omnipen* y el analgésico *Tylenol* para la fiebre.

Una vez en su hogar, la niña experimentó continuamente intenciones de vomitar, arrojó secreciones y su temperatura corporal fue inestable. A eso de las 2:00 A.M. del día siguiente empeoró: respiraba irregularmente, tenía sus manos frías y piernas cianóticas. Mientras su padre la levantaba de la cama, vomitó un líquido color marrón. Desafortunadamente falleció durante el trayecto hacia el Hospital. Como causa del deceso se determinó que Michelle se asfixió porque vomitó y aspiró a las vías respiratorias su contenido gástrico.

Subsiguientemente sus padres demandaron al doctor Maldonado Vázquez, a Yauco Primary Care Group y otras entidades. Previa vista evidenciaria, el Tribunal Superior, Sala de Ponce (Hon. Tomás Torres Marrero, Juez), concluyó que el doctor Maldonado Vázquez incurrió en negligencia al no practicarle a Michelle un examen completo y retenerla hospitalizada, al omitir ordenar la administración de los medicamentos *vía intravenosa* (en vez de oral) y al dejar de instruir a su padre sobre qué hacer si ella no respondía a ese tratamiento.

Además, el ilustrado foro de instancia determinó que los padres de Michelle también fueron negligentes al no darle una mejor vigilancia y seguimiento, especialmente mientras ella dormía. En virtud de esos pronunciamientos, estimó la responsabilidad de los codemandados doctor Maldonado Vázquez *et al.* en sesenta por ciento (60%); además, le imputó el remanente a los padres de Michelle. A base de los daños estimados, el doctor Maldonado Vázquez *et al.* deberán satisfacer la suma total de sesenta mil novecientos dólares ($60,900), intereses, más dos mil dólares ($2,000) de honorarios de abogado. A su solicitud, revisamos.

## II

*Tonsilitis aguda* es una enfermedad infecciosa ocasionada por la invasión de estreptococos hemolíticos que afecta principalmente las amígdalas y la faringe. La concentración de la infección en esta área relativamente pequeña es una inflamación localmente severa, de marcadas reacciones. *Es la causa principal de enfermedades respiratorias serias en los niños; grupo de edad en el cual se refleja una gran incidencia de esta afección.* No es raro que la fiebre pase de los cuarenta (40) grados centígrados y, con frecuencia, se presenten complicaciones.

En este tipo de situación, procede la administración de antibióticos, acompañado de descanso y una dieta blanda con abundancia de líquidos. Si se evitan las complicaciones, la infección eventualmente desaparece cuatro (4) o cinco (5) días después. 4 *Attorney's Textbook of Medicine* Sec. 10B.31 (3ra ed. 1988); 3 *Cantor, Traumatic Medicine and Surgery for the Attorney*, pág. 243 *et seq.* (1960).

En este caso, con apoyo en la prueba, el foro de instancia fundó su determinación de negligencia en la falta de atención adecuada del doctor Maldonado Vázquez. Concluyó que Michelle mostraba claramente un alto grado de *deshidratación*, el cual justificaba una atención más agresiva y prolongada y, por ende, el referido galeno debió mantenerla en el Hospital para observación y medicación *intravenosa*.

## III

No podemos, pues, hacernos eco del alegato de los demandados Maldonado Vázquez *et al.* de que no quedó establecido el *grado* de deshidratación que la infortunada niña tenía; no existió necesidad de mantenerla bajo observación continua, y no hubo prueba de que ella expulsara los medicamentos orales al vomitar.

La sintomatología que Michelle mostraba revela un cua-

dro claro de deshidratación —múltiples vómitos previos y los labios resecos— que en la buena práctica de la Medicina requería la aplicación rápida de suero intravenoso, que hubiese evitado su total deshidratación y permitido la administración del antibiótico por esa vía, sin causarle la grave irritación estomacal que le provocó más vómitos, aún cuando se le aplicó Tigán. Es de conocimiento elemental que una criatura de corta edad que padece de vómitos incontrolables corre el grave e inmediato riesgo de deshidratarse. La inadecuacidad del tratamiento incrementó esos vómitos, la expulsión del antibiótico y la aspiración eventual del jugo gástrico que le provocó la asfixia. Ciertamente las probabilidades de supervivencia de la pequeña Michelle habrían sido mayores de haber permanecido adecuadamente atendida en el Hospital.

Aun bajo la más amplia latitud de discreción profesional, no podemos situar esta actuación negligente como eximente.

— O —

Opinión disidente emitida por el Juez Presidente Señor Andréu García, a la cual se une el Juez Asociado Señor Alonso Alonso.

A la luz de toda la evidencia que fue presentada en el foro de instancia, no se demostró mediante la preponderancia de la prueba que el diagnóstico y tratamiento administrado por los demandados recurrentes a la niña Michelle Marie Flores Romero fuera la causa de su muerte. En vista de ello, nos vemos obligados a disentir de la decisión mayoritaria que confirma la sentencia impugnada.

I

El 16 de diciembre de 1984, a eso de las 9:30 de la mañana, el codemandante recurrido, Alberto Flores Ramírez,

llegó al Centro de Diagnóstico y Tratamiento de Guánica (en adelante C.D.T.) en compañía de dos (2) de sus hijos pequeños, Michelle y Jason de cinco (5) y siete (7) años de edad, respectivamente. Ambos niños amanecieron ese día con fiebre y vómitos. En especial, la niña Michelle Marie Flores padecía de una fiebre de 38.5 grados centígrados y de vómitos. El C.D.T. no contaba con la asistencia de un facultativo médico, por lo que ambos niños fueron referidos a la Sala de Emergencia del Hospital Dr. Tito Mattei en Yauco (en adelante Hospital), a donde llegaron a las 10:30 de la mañana, aproximadamente. Las enfermeras del Hospital procedieron a preparar un expediente médico de los menores con la información que les suministró el codemandante recurrido Flores Ramírez. Este expediente médico indica que, cuando fue examinada en el Hospital, la temperatura de la niña había aumentado a 39.5 grados centígrados y mostraba los labios resecos; no le tomaron los signos vitales de respiración, presión sanguínea o pulso. Según surge del expediente médico, los niños fueron atendidos por el médico de guardia, Dr. José Maldonado, a las *12:02 de la tarde.* Éste, luego de interrogar al padre y realizarle un examen físico a ambos niños, determinó que tanto Michelle Marie como Jason padecían de tonsilitis aguda (amigdalitis) al encontrarse las amígdalas de ambos "hipertróficas y[sic] hiperémicas". Petición de revisión, pág. 3. El padre de la niña le indicó al galeno que ésta había vomitado en varias ocasiones.(1) El doctor Maldonado ordenó que se le inyectara a la paciente una dosis de "Tigán" para controlar los vómitos y un supositorio de aspirina para controlar la fiebre. Además, le prescribió ampicilina por la vía oral (Omnipen), como antibiótico, para atacar la infección. E.N.P., págs. 17–18. Acto seguido, dio de alta a la paciente y le recetó "Tylenol" para la fiebre, lo cual

---

(1) En el juicio declaró que la niña vomitó varias veces en la sala de espera del Hospital mientras esperaba que el médico la viera, *pero que no le informó de ello a dicho médico.*

no aparece anotado en el expediente médico. El doctor Maldonado instruyó al padre de la menor para que le administrara a ésta ampicilina por la vía oral cada seis (6) horas, hasta que mostrara una mejoría.

Los menores regresaron a la casa con su padre, donde la madre, Dorka Ivette Romero Cruz, comenzó a administrarle los medicamentos que había prescrito el médico. Aunque la niña continuó enferma, ésta dejó de vomitar y su temperatura bajó a lo normal. E.N.P., pág. 12. Esa noche los demandantes recurridos acostaron sola a la niña en la habitación que compartía con su hermanito y *ellos se acostaron a dormir en la habitación matrimonial.* Como a las *2:00 de la mañana* la madre de la niña se despertó al oír una respiración irregular proveniente del cuarto de los niños y pensó que su hijo Jason estaba teniendo problemas para respirar. Al llegar al cuarto observó que Jason estaba dormido, pero se sorprendió al ver que Michelle Marie tenía las manitas frías, las piernitas estaban cianóticas y no respondía a sus llamados. El padre la levantó de la cuna y la niña vomitó un líquido color marrón (*brown*). E.N.P., pág. 12. La llevaron al Hospital, donde le indicaron que la niña había llegado muerta. El protocolo de la autopsia reveló que la menor Michelle Marie Flores Romero murió debido a *"una broncoaspiración del contenido gástrico"*, (énfasis suplido) pues tenía gran cantidad de líquido en la tráquea y en los bronquios.

En vista de lo ocurrido, los padres de Michelle Marie presentaron el 19 de junio de 1985 una acción en daños y perjuicios contra el médico que la atendió y contra la institución hospitalaria. Alegaron, en síntesis, haber sufrido daños por la muerte de su hija a causa de la negligencia en el tratamiento administrado por el doctor Maldonado y el Hospital en donde labora.

Luego de la vista en su fondo, el tribunal de instancia dictó sentencia imponiéndole un sesenta por ciento (60%) de responsabilidad al médico y al Hospital, y un cuarenta

por ciento (40%) de negligencia a los demandantes recurridos. En dicha sentencia se condenó a los demandados a pagar sesenta mil dólares ($60,000) por concepto de daños, la suma de novecientos dólares ($900) por concepto de gastos especiales y la suma de dos mil dólares ($2,000) por concepto de honorarios de abogado, más intereses al tipo legal sobre la cuantía de la sentencia.

De esta sentencia acudieron en revisión los demandados recurrentes para imputarle al tribunal de instancia haber errado:

... [A]L AQUILATAR LA PRUEBA EN FORMA ARBITRARIA, LO QUE NO REPRESENTA EL BALANCE MÁS JUSTICIERO Y JURÍDICO DE LA TOTALIDAD DE LA PRUEBA. Petición de revisión, pág. 4.

A nuestro juicio, los recurrentes tienen razón al hacer dicho señalamiento.

## II

En el pasado, este Tribunal ha establecido, como sabia norma de deferencia judicial, que se ha de respetar y sostener la apreciación que hagan los jueces de instancia sobre la prueba que se desfile ante ellos. Ante una clara ausencia de pasión, prejuicio, parcialidad o error manifiesto, el tribunal apelativo se abstendrá de intervenir con la apreciación hecha por el tribunal original.[2] *Pueblo v. Maisonave Rodríguez*, 129 D.P.R. 49 (1991); *Pueblo v. Cabán*

---

[2] El Prof. Herminio M. Brau Del Toro *nos indica:*

"Finalmente, deseamos destacar que el Tribunal Supremo reiteró que *un tribunal apelativo puede descartar las conclusiones de hechos del tribunal sentenciador cuando éstas no representan el balance más racional, justiciero y jurídico de la totalidad de la prueba. Esto es particularmente cierto en casos, como el de autos, en que la prueba ante la Superioridad Apelativa consiste esencialmente en testimonio pericial, que es lo que ocurre las más de las veces en casos de responsabilidad de médicos y de hospitales,* y de instituciones dedicadas al cuidado y tratamiento de enfermos. Ante este tipo de prueba[,] el tribunal apelativo está en igualdad de condiciones para apreciarla que el Tribunal de instancia, y en libertad de adoptar su propio criterio." (Énfasis suplido.) H. Brau Del Toro, *Los daños y perjuicios extracontractuales en Puerto Rico*, 2da ed., San Juan, Pubs. J.T.S., 1986, Vol. I, pág. 246.

*Torres*, 117 D.P.R. 645, 654 (1986); *Pueblo v. De Jesús Rivera*, 113 D.P.R. 817, 826 (1983); *Pueblo v. Turner Goodman*, 110 D.P.R. 734, 738 (1981).

No obstante, no hemos vacilado en alterar o revocar cualquier dictamen *"cuando un examen detenido de toda la prueba nos convence que el juzgador descartó injustificadamente elementos probatorios importantes o fundó su criterio únicamente en testimonios de escaso valor, o inherentemente improbables o increíbles"*. (Énfasis en el original y cita omitida.) *Pueblo v. Luciano Arroyo*, 83 D.P.R. 573, 581 (1961).

En otras palabras, dicha norma le permite a esta Curia revocar una sentencia cuando, al examinar la prueba, ésta no sostiene la determinación de instancia de que el accidente se debió a la culpa o negligencia del demandado. No confirmaremos sentencias que —en sus fundamentos— carezcan de prueba que las sustente, según el *quantum* de evidencia requerido. *Vázquez v. A.F.F.*, 99 D.P.R. 547, 549 (1971). De la misma forma, hemos expresado en innumerables ocasiones que —en relación con la apreciación de prueba pericial— este Tribunal se encuentra en igualdad de condiciones que el tribunal de instancia y en libertad de adoptar su propio criterio. *Prieto v. Maryland Casualty Co.*, 98 D.P.R. 594, 623 (1970). Aclarado ese extremo, procedamos a examinar la sentencia recurrida.

### III

El tribunal de instancia —ahora avalado por la mayoría de este Tribunal— determinó que el doctor Maldonado erró al no dedicar más tiempo a la paciente, ni practicarle un examen más amplio ni ofrecer el tratamiento más adecuado y eficaz de acuerdo con la condición de deshidratación que presentaba la niña.

Este Tribunal ha expresado en varias ocasiones que

*[e]n nuestra función revisora no somos un tribunal de peritos*

*médicos, aunque tengamos que pasar juicio sobre prueba peri-cial médica.* Tal enfoque de nuestra función no constituye una abdicación de la misma, sino una reafirmación de los paráme-tros y deslindes que hemos establecido entre las funciones de este Tribunal, la de los tribunales de instancia, el peritaje mé-dico y la naturaleza y función judicial. (Énfasis suplido.) *Rodrí-guez Crespo v. Hernández,* 121 D.P.R. 639, 642 (1988).

Hemos indicado en el pasado que las acciones por impe-ricia profesional se rigen por el Art. 1802 del Código Civil, 31 L.P.R.A. sec. 5141. Véanse: *Ramos v. Orientalist Rattan Furnt., Inc.,* 130 D.P.R. 712 (1992); *Chévere v. Cátala,* 115 D.P.R. 432 (1984). El promovente de una acción de daños y perjuicios, bajo dicho artículo, tiene la obligación de esta-blecer la negligencia o impericia del profesional mediante la presentación de evidencia que sostenga la afirmativa de la controversia alegada.[3] Expresamos en *Asoc. Auténtica Empl. v. Municipio de Bayamón,* 111 D.P.R. 527, 531 (1981), que "meras alegaciones o teorías no constituyen prueba".[4]

El citado Art. 1802 exige que se demuestre la concurren-cia de tres (3) requisitos que evidencien la responsabilidad del demandado por el daño causado. Hemos señalado que el promovente de una acción de daños y perjuicios deberá establecer la existencia de un acto u omisión que medie culpa o negligencia, que se produzca un daño real y posi-tivo, *y que existe un nexo causal entre el acto u omisión culposo o negligente y el daño. Díaz v. The San Juan L. & T. Co.,* 17 D.P.R. 69 (1911); H.M. Brau Del Toro, *Los daños y perjuicios extracontractuales en Puerto Rico,* 2da ed., San Juan, Pubs. J.T.S., 1986, Vol. I, págs. 58 y 180; *Rodríguez Crespo v. Hernández,* supra; *Torres Ortiz v. Plá,* 123 D.P.R. 637 (1989), y casos allí citados.

Aunque nuestra jurisprudencia ha establecido en mu-

---

[3] Regla 10(B) de Evidencia, 32 L.P.R.A. Ap. IV.

[4] Véanse, además: *Ramos, Escobales v. García, González,* 134 D.P.R. 969 (1993); *Defendini Collazo et al. v. E.L.A., Cotto,* 134 D.P.R. 28 (1993); *Reece Corp. v. Ariela, Inc.,* 122 D.P.R. 270 (1988).

chas ocasiones que no es necesario demostrar una única y precisa causa de daño, es indispensable que el demandante pruebe, por preponderancia de evidencia, que la conducta culposa o negligente fue el elemento que con mayor probabilidad lo causó. *Medina Vda. de López v. E.L.A.*, 104 D.P.R. 178 (1975), y *López v. Hosp. Presbiteriano, Inc.*, 107 D.P.R. 197 (1978). El elemento de la causalidad es uno de los factores más importantes en la determinación final de la responsabilidad del demandado. El demandante pudo haber sufrido un daño a consecuencia de algún acto u omisión culposa o negligente; sin embargo, el promovente tiene la obligación de demostrar que fue un acto u omisión *del demandado* el que con mayor probabilidad lo causó. "En derecho, una persona no es responsabilizada de todas las posibles consecuencias de su actuación negligente ... Tal persona no es responsable por una causa remota. Un daño parece ser el resultado natural y probable de un acto negligente si después del suceso, y mirando retroactivamente al acto que se alega ser negligente, tal daño aparece como la consecuencia razonable y ordinaria del acto." *Torres Trumbull v. Pesquera*, 97 D.P.R. 338, 343–344 (1969). Además, si el daño es previsible, el actor tiene responsabilidad. Sin embargo, si no es previsible estamos ante un caso fortuito. C. Rogel Vide, *La responsabilidad civil extracontractual*, Madrid, Ed. Civitas, 1976, pág. 91.

En los casos de impericia médica, nuestra jurisprudencia establece la norma mínima de atención esperada de los facultativos médicos en el desempeño de sus funciones. En *Oliveros v. Abréu*, 101 D.P.R. 209, 226 (1973), expresamos la siguiente norma de atención médica exigible legalmente en casos de impericia profesional:

> Aquella que, reconociendo los modernos medios de comunicación y de enseñanza, establece que el nivel o calidad de esa atención debe ser la que llena las exigencias profesionales generalmente reconocidas por la profesión médica.

Reconocimos en aquella ocasión que la Medicina es

como una "ciencia arte". Con eso quisimos asentir la discreción que le reconoce la profesión y este Tribunal a los juicios y a las decisiones que tome el facultativo a la luz de la práctica aceptada. Indicamos entonces que: "[h]ay en ese proceso un inevitable elemento subjetivo. También, la relación de médico y paciente es, o debe ser, única para ambos. ... La constitución física de cada ser humano es distinta, como lo es su sicología y su idiosincrasia." *Oliveros v. Abréu*, supra, pág. 227. Lo expresado allí demuestra, por una parte, "la responsabilidad que asume el médico al diagnosticar y al tratar y, por otro, la necesidad de reconocer el elemento humano, subjetivo, no exacto, de su quehacer". (Cita omitida.) Íd.

Además, hemos resuelto —como doctrina general— que es la parte demandante la que tiene la obligación de poner al Tribunal en la posición de poder hacer una determinación a base de una prueba clara y convincente sobre la negligencia del demandado. *Cotto v. C.M. Ins. Co.*, 116 D.P.R. 644 (1985). No debemos olvidar que existe una presunción rebatible en cuanto a que el médico le suministró al paciente el tratamiento adecuado de acuerdo con las normas reconocidas en la profesión. *Ramos Orengo v. La Capital*, 88 D.P.R. 315 (1963). En *Torres Ortiz v. Plá*, supra, pág. 650, expresamos que: "la norma sobre relación causal en casos de mala práctica médica exige que de la prueba presentada tiene que surgir *que el tratamiento ofrecido por el médico demandado fue el que con mayor probabilidad causó el daño.*" (Énfasis suplido.)

## IV

A tenor con los principios mencionados, comencemos nuestro examen de los hechos con la prueba pericial de la parte demandante que consiste en el testimonio del Dr. Juan Santiago. Dicho perito atestiguó que el antibiótico (Omnipen), que el médico le administró a la paciente, le

pudo irritar el estómago y producir vómitos. Según dicho facultativo, ante un cuadro de deshidratación, fiebre e infección debió administrarse a la paciente un suero y antibiótico intravenoso. El referido perito testificó que el líquido "brown", que vomitó la niña al ser levantada por su padre, es muestra de sangramiento de las paredes gástricas. Finalmente, expresó que el médico demandado debió dejar a la niña en observación para determinar si el tratamiento administrado estaba teniendo éxito.

Por otra parte, el perito de los demandados, Dr. Silvio Vélez Estrada, declaró que el diagnóstico y tratamiento ofrecido por el demandado fue acertado a la luz de la práctica aceptable de la profesión.

En síntesis, la parte recurrida alega que el doctor Maldonado actuó de forma negligente al: (a) realizar un diagnóstico, una evaluación y un tratamiento incorrectos; (b) no llevar un expediente médico adecuado; (c) no hospitalizarla a pesar de estar deshidratada; (d) realizar un examen insuficiente de los pacientes, y (e) administrar instrucciones erróneas al padre de los niños.

Examinemos en detalle cada una de dichas actuaciones alegadas.

A. *Realizar diagnóstico, evaluación y tratamiento incorrectos*

La *tonsilitis aguda* es una infección común en los niños y la causa principal de serios problemas respiratorios a esta edad. Dicha infección es causada por la invasión de la bacteria *hemolytic streptococci* en el área de las amígdalas y la faringe. Ésta se compone de una gran concentración de membrana mucosa infectada, en un área relativamente pequeña, que resulta en una inflamación severa de las amígdalas, las cuales se tornan rojas y engrandecidas. Los síntomas son variados: inflamación de las amígdalas, fiebre alta, dolor muscular y hasta dificultad al tragar. 4 *Attorneys' Textbook of Medicine* Sec. 10B.31, pág. 10B-11 (3ra ed. 1988).

En el caso ante nuestra consideración, no hubo controversia alguna en cuanto a que la niña padecía de una tonsilitis aguda, ni que tenía las amígdalas inflamadas. Tampoco fue controvertido que la causa de la muerte de la niña fue la asfixia causada por la aspiración de líquido gástrico. De modo que los demandantes tenían la obligación de presentar una prueba que demostrara que tanto el diagnóstico como el tratamiento realizado por el médico, además de inadecuados y negligentes, fueron una causa eficaz de la muerte de la menor.

En el contrainterrogatorio al perito de la parte recurrida, éste aceptó que *no era médicamente previsible que la niña continuara vomitando* luego de habérsele administrado "Tigán", medicina que comúnmente se utiliza para controlar los vómitos, y añadió que el vómito *"puede venir en cualquier momento por otras razones que no estuvieren relacionadas con la enfermedad"*. (Énfasis suplido.) E.N.P., pág. 8.

A la luz de los síntomas que presentaba la niña y del testimonio de dicho perito, somos del criterio que éste no demostró que la actuación de los demandados recurrentes estuviera reñida con la práctica aceptada que reconoce la profesión médica, o que su diagnóstico o tratamiento fue equivocado. De hecho, el doctor Santiago indicó que "el tratamiento usado por el Doctor Maldonado para los vómitos y la fiebre es correcto, para eso nada más, ... [pero] le faltó hacer otras cosas". E.N.P., pág. 7. Ante un cuadro de vómitos, de fiebre y de amígdalas inflamadas, el diagnóstico del doctor Maldonado fue acertado. Éste procedió a atacar la infección con ampicilina; los vómitos con "Tigán", y la fiebre con aspirina. E.N.P., págs. 17–18. Inclusive, el perito de los demandantes señaló que para atender una infección como la que tenía Michelle Marie, el medicamento más apoyado por la clase médica es el antibiótico.(5) La ampicilina es un antibiótico reconocido en el campo médico como

_____
(5) Más aún, el doctor Gray nos informa lo siguiente:

un medicamento adecuado para atacar infecciones como la tonsilitis aguda. E.N.P., pág. 23. En *Pérez Torres v. Bladuell Ramos*, 120 D.P.R. 295, 303–304 (1988), indicamos que

> ... en el tratamiento de un paciente el médico posee amplia *discreción profesional y que éste no incurre en responsabilidad si el tratamiento que le brinda a su paciente, aun cuando erróneo, está enmarcado en los linderos de lo razonable y es aceptado por amplios sectores de la profesión médica*; constituyendo defensa válida para el médico demandado la existencia de divergencia de criterios entre las autoridades médicas sobre si el tratamiento o procedimiento en particular era correcto bajo las circunstancias del caso. (Énfasis suplido.)

Por otro lado, aunque el mencionado perito argumentó que la administración del antibiótico por la vía oral fue contraproducente en este caso, el resultado de la autopsia no sustentó tal aseveración.

En *Cruz v. Centro Médico de P. R.*, 113 D.P.R. 719, 736 (1983), expresamos que "[n]o es función de este Tribunal prescribir tratamientos médicos". Por lo tanto, la presunción de que el médico realizó un tratamiento adecuado requiere que el demandante establezca la relación causal sin recurrir a conjeturas, especulaciones o meras posibilidades. Véase *Sáez v. Municipio de Ponce*, 84 D.P.R. 535 (1962).

En este caso, el perito de la parte recurrente, doctor Vélez Estrada, señaló que a un paciente que se le haya administrado "Tigán" para controlar los vómitos, se le puede suministrar medicamentos orales. E.N.P., pág. 24. Además, indicó que la administración del antibiótico por la vía oral es una "cuestión de criterio médico", aseveración que no fue controvertida por la parte demandante. Opinó el perito del demandado que el tratamiento dado a la refe-

---

"The treatment of acute tonsillitis is similar to that of acute pharyngitis. *Antibiotic therapy shortens the course of the illness and prevents the development of complications.*" 4 *Attorney's Textbook of Medicine* Sec. 10B.31(4), pág. 10B-12 (3ra ed. 1988).

rida menor "fue adecuado y cumple con la condición de tonsilitis aguda diagnosticada, basado ello en el historial efectuado y en el examen físico practicado a la paciente". Íd., pág. 21.

De los hechos probados en instancia podemos observar que la niña fue dada de alta del Hospital a las 12:02 del mediodía. Estuvo todo el día en su casa descansando. A pesar de que la menor continuó enferma, ésta dejó de vomitar y su temperatura bajó a lo normal. Esto explica por qué sus padres no la llevaron de nuevo al Hospital y demuestra que el tratamiento administrado tuvo éxito. No fue sino hasta las 2:00 de la mañana, catorce (14) horas después de haber sido atendida en el Hospital, cuando la madre de la paciente la encontró asfixíandose en su cama. E.N.P., pág. 14. Dicho evento no era previsible a la luz de los síntomas presentados por la paciente cuando fue atendida por el recurrente. El balance más justiciero de la totalidad de la prueba pericial presentada en instancia no demuestra una causalidad adecuada entre la actuación de los demandados y la muerte de la niña. Ello es así en vista de la prueba desfilada al efecto de que no era médicamente previsible que la menor muriera asfixiada en su propio vómito *catorce (14) horas después* de habérsele administrado el medicamento adecuado para evitarlos.

El testimonio del Dr. Juan Santiago, a los efectos de que la muerte de la paciente fue causada por deshidratación, medicamentos erróneos y falta de observación *es especulativo y no encuentra apoyo en la prueba presentada.* La condición de la paciente no empeoró al ser tratada con un antibiótico líquido. No se demostró —en forma alguna— que el medicamento líquido irritara su estómago provocando más vómitos que le causaran la muerte. De haber sangrado, como especuló el perito de la parte demandante, ello hubiera sido confirmado por el patólogo en su autopsia. El expediente está huérfano de un hallazgo a esos efectos.

En el caso ante nos, el médico realizó un diagnóstico y tratamiento que estuvieron adecuados para la sintomatología que presentó la paciente cuando fue examinada. Se anotó en el expediente la temperatura corporal de la niña y el diagnóstico de tonsilitis aguda. Además, se señaló que la niña padecía de fiebre alta, vómitos, amígdalas "hipertróficas y[sic] hiperémicas". También se indicó el peso, el medicamento administrado y la condición física de la paciente al llegar al Hospital. Dicha información era suficiente para darnos un cuadro claro de la condición de la paciente. El mero hecho de que no se anotara una información más detallada en el expediente médico en nada afectó la labor realizada por el galeno. No se demostró la relación causal entre el no anotar toda la información presuntamente pertinente y la alegada negligencia en el diagnóstico o tratamiento realizado.

B. *No hospitalizar a la menor a pesar de estar deshidratada*

Existe una gran controversia en este caso sobre si la niña estaba o no deshidratada. A esos efectos, el expediente médico sólo indica que la menor llegó al hospital con fiebre alta, vómitos y los labios resecos. Tal anotación llevó al perito de la *parte recurrida* a concluir que Michelle Marie estaba deshidratada(6) y, por lo tanto, había que dejarla bajo observación en el Hospital.(7)

Sobre dicho asunto, el perito de los recurridos expresó que si una persona enferma padece de esa condición, el

---

(6) La deshidratación es "[p]érdida excesiva de agua en el organismo. ... Pueden originar deshidratación anormal algunas afecciones acompañadas de fiebre, y ciertos trastornos, como diarrea, vómitos, etc.". M. Fishbein, *Enciclopedia familiar de la medicina y la salud*, Nueva York, Ed. Stuttman Co., 1964, Vol. 1, págs. 205–206.

(7) El doctor Santiago declaró lo siguiente:

"Entiende que de acuerdo a una nota de la enfermera la paciente se estaba deshidratando, pues la nota habla de labios resecos y temperatura bien alta. ...Que se debió bajar la temperatura, ser tratada contra la deshidratación y ponerla bajo observación." E.N.P., págs. 2–3.

cuerpo estará débil, lo que provocará un período mayor de recuperación. Conforme con el testimonio ofrecido en instancia, un paciente que padece de vómitos corre el peligro de deshidratarse. No obstante, la prueba pericial médica presentada en el tribunal a quo estableció que dependiendo del grado de deshidratación del paciente así será el grado de discreción que se le reconocerá al médico. E.N.P., págs. 21–22. Sólo en los casos en que exista una deshidratación severa se requerirá la hospitalización.[8] Por otra parte, dicha condición le permite en un grado moderado al galeno decidir, a base de un examen físico, si ambulatoriamente se puede o no hidratar con fluidos. Finalmente, en el caso de la deshidratación leve, *el médico tiene una amplia discreción en el tratamiento a seguir.* Entonces, cabe preguntarse, ¿qué tipo de deshidratación, si alguna, sufría la niña Michelle Marie? Según el testimonio del doctor Santiago, la paciente estaba deshidratada al momento de ser tratada por el codemandado. Sin embargo, cada uno de los peritos presentados por las partes aseveraron que un médico puede determinar el grado de deshidratación de una persona *realizando un examen visual del paciente.* Es prueba aceptada que el doctor Maldonado le realizó un examen físico a la niña. La Exposición Narrativa de la Prueba nos indica los pasos que siguió el demandado en dicho examen:

> Que le examinó la garganta, oídos, pupilas y *las conjuntivas de ambos ojos* y el cuello. Se auscultaron los latidos cardíacos y sonidos respiratorios. Se palpó el vientre y se observaron las extremidades y la piel del paciente. Que los resultados de esos exámenes fueron negativos, a excepción de encontrar las amígdalas engrandecidas y enrojecidas y que la niña estaba febril, con una temperatura alta. (Énfasis suplido.) E.N.P., pág. 17.

Al completar el doctor Maldonado dicho examen, él estaba en posición de determinar si la niña estaba o no deshidratada. Al examinar la garganta, los ojos y las pupi-

---

[8] E.N.P., págs. 21–22.

las, el médico tuvo ante sí toda la prueba necesaria para llegar a un cuadro médico de la condición del paciente. El perito de los recurrentes —doctor Vélez— afirmó que la deshidratación moderada a severa "refleja en el paciente *unos ojos con pérdida de brillo y con apariencia dócil, grisáceos y hundidos*; las mucosas nasal y oral y *la lengua se observan secas también*". (Énfasis suplido.) E.N.P., pág. 21. Si bien es cierto que los vómitos pudieron causar cierto grado de deshidratación y los labios resecos pueden ser señal de tal hecho, no es menos cierto que el recurrente al examinarla tuvo la oportunidad de determinar, con mayor certeza, si la niña estaba o no deshidratada y el grado de severidad de la deshidratación. Los labios resecos, aunque pueden ser indicios de deshidratación, también pudieron haber sido causados por la propia condición de la tonsilitis. El doctor Vélez declaró que los "labios resecos" pueden ser causados al respirar por la boca, *una condición normal en niños que padecen de tonsilitis y están vomitando*. Los demandantes recurridos nunca presentaron alguna prueba que demostrara que la niña padecía de un grado tal de deshidratación que hubiera requerido un período más prolongado de observación.

Por el contrario, el doctor Maldonado la examinó y no encontró síntomas visuales que le indicaran que la niña estaba deshidratada. Dicho marco de circunstancias le reconoce un amplio margen de discreción al médico para determinar el tratamiento que debe seguir. De todas formas, aparte de cualquier especulación que pueda formularse a esos efectos, la evidencia presente en el caso deja de establecer en forma adecuada la relación causal entre la supuesta condición de deshidratación sufrida por la niña y su fallecimiento, la cual es un requisito indispensable para poder imponer responsabilidad al médico demandado.

C. *Examen físico insuficiente del paciente*

Los recurridos alegan que los paramédicos del Hospital no le tomaron el pulso ni la presión sanguínea a la niña, y

que el médico no le dedicó el tiempo suficiente al paciente para determinar con certeza cuál era su padecimiento. No obstante, de los hechos probados en el foro de instancia podemos concluir que el doctor Maldonado realizó toda gestión aceptada por la profesión a la luz de los conocimientos científicos disponibles. En *Rodríguez Crespo v. Hernández*, supra, pág. 650, expresamos:

> Para establecer prima facie un caso de daños y perjuicios por negligencia de un médico o de un dentista, el demandante tiene que presentar prueba sobre: (1) las normas mínimas de conocimiento y cuidado médico aplicables a los generalistas o a los especialistas, y (2) la relación causal entre la actuación u omisión del facultativo y la lesión sufrida por el paciente. *Medina Santiago v. Vélez*, supra. (Énfasis suplido.)

El mero hecho de que el médico haya realizado un examen físico de cinco (5) minutos no refleja falta de diligencia en el diagnóstico y tratamiento administrado. No se estableció un nexo causal entre el daño ocurrido (en este caso la muerte) y la impericia profesional de un diagnóstico equivocado por falta de tiempo en el examen realizado. No fue controvertido que la niña padeciera de una tonsilitis aguda, ni que los medicamentos administrados no fueran los aceptables, según las exigencias reconocidas en el campo médico. El tiempo que duró dicho examen será un factor que se habrá de considerar en la determinación final sobre si el galeno incurrió o no en negligencia.

Utilizando su discreción profesional, el doctor Maldonado procedió a darla de alta por entender que la paciente no requería tratamiento u observación ulterior. Al no presentarse prueba alguna que indicara que dicho proceder no es aceptado, a la luz de "las exigencias profesionales generalmente reconocidas por la profesión médica", el demandado no incurrió en negligencia que acaree responsabilidad.

D. *Instrucciones erróneas al padre de los niños*

Los demandantes arguyen que el médico demandado

meramente le indicó al padre que le administrara el medicamento recetado hasta que mostrara una mejoría. Alegan los demandantes que el médico debió haber instruido al padre de la niña sobre el comportamiento de ella y su reacción al medicamento administrado e indicarle que, de no responder al tratamiento, volviera al Hospital.

Sobre ese particular hemos expresado que la doctrina imperante en esta jurisdicción es que incurre en negligencia el médico que no informe al paciente sobre su padecimiento y los medicamentos que deben ser utilizados para controlarlo. Tal instrucción dependerá del carácter urgente de la enfermedad, el estado físico del paciente y su edad.

En el caso de autos, el doctor Maldonado dio las instrucciones siguientes:

> Expresó que al entregarle la receta al padre de la niña, le indicó, como instrucciones, que debía administrarle a la niña ampicilina por la vía oral en la casa cada 6 horas y continuar con esos medicamentos para que mejorara la condición. Además le indicó que le diera "Tylenol" para la fiebre, lo cual no incluyó en la prescripción, indicando que ello se vende sin prescripción. (Énfasis suplido.) E.N.P., pág. 18.

Como pudimos observar, el doctor Maldonado le indicó al padre de la menor cuándo debía administrar a la niña el medicamento recetado y para qué fue recetado. Evidentemente, el doctor entendió que dichas instrucciones eran suficientes a la luz de la condición del paciente. Dentro de su experiencia y conocimiento, la condición de la menor Michelle Marie no requería instrucciones más detalladas o minuciosas, pues su condición era estable. Más aún, la niña respondió de manera favorable al tratamiento, dejó de vomitar y su temperatura bajó a lo normal. En vista de ello, la parte demandante no estableció un nexo causal entre las instrucciones dadas al padre de la niña y su posterior muerte. La alegación de que las instrucciones fueron insuficientes debe ir acompañada de una prueba que demuestre que dicha insuficiencia fue la causa adecuada que propició la muerte del paciente. Meras alegaciones de in-

suficiencia no son una prueba adecuada en derecho para responsabilizar a un médico por impericia. *Reece Corp. v. Ariela, Inc.*, 122 D.P.R. 270 (1988). En vista de lo acontecido, nuestra opinión es que el médico demandado realizó toda gestión aceptada por la profesión médica.

## V

Un examen completo de la prueba revela su insuficiencia para responsabilizar a los demandados recurrentes por la muerte de la niña Michelle M. Flores Romero. A estos efectos indicamos en *Hernández v. La Capital*, 81 D.P.R. 1031, 1037 (1960), que: "El principio de responsabilidad sin causa, no importa lo socialmente útil que pueda parecer, no está autorizado por nuestras leyes."

A base de la prueba reseñada y analizada, concluimos que el tribunal de instancia erró al aquilatar la prueba, por lo que revocaríamos la sentencia recurrida y en su lugar desestimaríamos la demanda presentada en este caso.

## — O —

Opinión disidente del Juez Asociado Señor Rebollo López.

La muerte de un ser humano *siempre* es triste y penosa; *aun más, cuando se trata de una tierna criatura que apenas comenzaba a vivir.* Esa natural reacción y sentimiento, sin embargo, *no* puede tener el efecto de *confundirnos y desviarnos* de nuestra principal meta, esto es, la de hacerle *cumplida justicia* a *todas* las partes que comparecen ante el tribunal en busca, *precisamente*, de que se les haga justicia.

El descargo de la función judicial le brinda, de ordinario, *grandes satisfacciones* a los integrantes del foro judicial. *El presente caso, sin embargo, es un vivo ejemplo de aquellos casos a los que uno desearía no tener que*

*enfrentarse.* Hay una muerte, de una criatura de tierna edad, que todos desearíamos *no* hubiera ocurrido. Hay unos padres y familiares, afectados y adoloridos, para los cuales *nunca* habrá consuelo. Por otro lado, hay un facultativo médico que sostiene que no es responsable por esa muerte y que, de hecho, la niña murió por causas no atribuibles a la condición médica que requirió su intervención.

*¿Qué hacer?* La contestación resulta ser relativamente sencilla: hay que examinar, *en forma objetiva y desapasionada,* la *evidencia* que fue presentada por las partes a nivel de instancia y resolver, *a base exclusivamente de la misma,* si el médico codemandado incurrió en un acto de impericia médica que le causó la muerte a la niña. Contestamos dicha interrogante *en la negativa.* Llegamos a dicha determinación tomando en consideración *únicamente* los hechos que surgen, *de manera.incuestionable,* de la exposición narrativa de la prueba, certificada como correcta por el foro de instancia.

## I

Resulta ser un *hecho incontrovertido* que la niñita Michelle Marie Flores, al ser examinada por el Dr. José Maldonado el 16 de diciembre de 1984, como a eso de las doce del mediodía, presentaba un cuadro de temperatura relativamente alta —39.5 grados centígrados— vómitos y labios resecos. *Independientemente* del hecho de cuánto duró el examen físico que el doctor Maldonado le hiciera a la infortunada niña, lo cierto es que éste *la examinó* y que emitió, a base del examen realizado, *un diagnóstico correcto,* esto es, el de que la niña padecía de tonsilitis aguda o, en palabras de legos, infección severa de la garganta.

*Por otro lado,* también resulta *incuestionable* el hecho de que el doctor Maldonado *prescribió* los medicamentos *correctos o indicados* para la situación médica entonces ante su consideración, a saber: un antibiótico para la infec-

ción de garganta, un medicamento para controlar los vómitos y un analgésico para controlar la fiebre.

## II

Se alega, en apoyo de la contención de que el doctor Maldonado incurrió en un acto de impericia médica, *que* éste no le suministró un suero intravenoso para controlar la deshidratación; *que* no la hospitalizó con el propósito de observarla; *y que* no le dio instrucciones correctas a los padres de la niña respecto al tratamiento a seguir en el hogar. *Examinemos dichas alegaciones.*

La niña obviamente *no* estaba deshidratada a las doce del mediodía del 16 de diciembre de 1984 cuando fue vista, y examinada, por el doctor Maldonado. El mero hecho de que tuviera sus labios resecos *no* constituye evidencia concluyente de dicha condición. Por otro lado, *no* se presentó a nivel de instancia prueba, *creíble y confiable,* a los efectos de que la niña se hubiera deshidratado en algún momento. Hay que recordar que la infortunada niñita muere el 17 de diciembre, como a eso de las 2:00 A.M., *conforme al patólogo forense,* de una "broncoaspiración del contenido gástrico", esto es, se *asfixió* con sus propios jugos gástricos. *Este hecho derrota no sólo la alegación de que la niña se deshidrató sino que es demostrativo de ausencia total de relación causal entre el tratamiento médico brindádole, o ausencia del mismo, y la muerte ocurrida.*

Por otro lado, y en cuanto a la alegación de negligencia por no haber hospitalizado a la niña, basta con decir que si los facultativos médicos fueran a hospitalizar a todos los pacientes —*niños y adultos*— que sufren de una tonsilitis aguda, realmente *no* habría acomodo para ningún otro paciente en los hospitales de Puerto Rico. De ordinario, una tonsolitis aguda *no* requiere hospitalización del paciente; eso lo sabe hasta un lego que haya vivido algunos años.

Por último, somos del criterio que las instrucciones que

le brindó el doctor Maldonado al padre de la niña —a los efectos de que le suministrara los medicamentos recetados y la mantuviera bajo observación— fueron adecuadas y suficientes conforme a los hechos particulares del caso. De todas formas, el "procedimiento o tratamiento" a seguir por éstos *era cuestión de sentido común.*

### III

En resumen, *no* hay duda que *todos* desearíamos que la niña Michelle Marie Flores *no* hubiera fallecido. Ese hecho —*que consterna y causa dolor*— *no* es suficiente, sin embargo, para imponerle responsabilidad a un médico que, dentro del cuadro de hechos que tuvo ante su consideración, *le brindó a su paciente un diagnóstico y tratamiento, adecuado y correcto,* que satisface las exigencias generalmente reconocidas por la profesión médica en relación con casos o situaciones de la misma naturaleza; todo ello conforme a los modernos medios de comunicación y enseñanza y el estado de conocimiento de las ciencias y práctica prevaleciente en la medicina. *Ramos, Escobales v. García, González,* 134 D.P.R. 969 (1993); *Oliveros v. Abréu,* 101 D.P.R. 209 (1973).

*¿Por qué penalizar a este facultativo médico por una muerte desafortunada?* Aparte del hecho de que nada se "logra" con ello, al así hacerlo se *incumple* con nuestra delicada función judicial. Debe recordarse que el *mero* hecho de que ocurra un daño en esta clase de situaciones, necesariamente *no* significa que haya ocurrido un acto de impericia médica.

Repetimos, nos encontramos ante una situación en que un médico *diagnostica correctamente* la condición de salud que afecta al paciente y que *prescribe el tratamiento adecuado* para dicha condición. *¿Que más se le puede pedir a los facultativos médicos en nuestra jurisdicción?* Hay que recordar que éstos, después de todo, *no* poseen el "don di-

vino" de garantizar la vida de sus pacientes contra todo riesgo imaginable.

La opinión suscrita por una mayoría de los integrantes del Tribunal, que erróneamente le impone responsabilidad al facultativo médico que atendió la niña en el presente caso, *es un ejemplo más de uno de los graves males que aqueja a este Tribunal.* Nos referimos a la *ausencia de firme criterio, o filosofía jurídica,* por parte de los integrantes del Tribunal respecto a los distintos campos del derecho; situación que causa que el Tribunal *continuamente* esté emitiendo *decisiones contradictorias* que lo que hacen es *confundir* a nuestros tribunales de instancia y a los miembros de la profesión, los cuales *no* saben a qué atenerse.