# 2006 DTA 70

**TRIBUNAL DE APELACIONES
REGIÓN JUDICIAL DE PONCE
PANEL X**

JOSÉ S. DÍAZ RÍOS, ROSARIO Y. LÓPEZ TORRES, POR SÍ Y EN REPRESENTACIÓN DE LA SOCIEDAD LEGAL DE GANANCIALES COMPUESTA POR AMBOS
Apelados

v.

HOSPITAL SANTO ASILO DE DAMAS, SU COMPAÑÍA ASEGURADORA AMERICAN INTERNATIONAL INSURANCE, CO.; DR. RICARDO BARNES ESPAÑOL, SU SEÑORA ESPOSA IVY LYNNE PATRON, Y LA SOCIEDAD LEGAL DE GANANCIALES COMPUESTA POR AMBOS; DR. CARLOS RIVERA PÉREZ, SU SEÑORA ESPOSA HOLLITE BEGIDO Y LA SOCIEDAD LEGAL DE GANANCIALES COMPUESTA POR AMBOS, Y H/N/C COMO INSTITUTO GINECO-OBSTÉTRICO Y SU RESPECTIVA COMPAÑÍA ASEGURADORA SEGUROS TRIPLE S, INC.
Apelantes

Núms. Cons. KLAN-05-00590 / KLAN-05-00601 / KLAN-05-00606

San Juan, Puerto Rico, a 18 de abril de 2006

Panel integrado por su Presidente, el Juez Brau Ramírez,
el Juez Colón Birriel y la Juez Hernández Torres

Brau Ramírez, Juez Ponente

**TEXTO COMPLETO DE LA SENTENCIA**

**I**

Se trata de una demanda por daños y perjuicios instada ante el Tribunal de Primera Instancia, Sala Superior de Ponce, por los esposos apelados Rosario López Torres y José Díaz Ríos contra la parte apelante, Dr. Ricardo Barnes Español, el Hospital Santo Asilo de Damas (*"Hospital Damas"*) y la compañía de Seguros American International Insurance Company (*"American"*).

La demanda está relacionada al tratamiento médico brindado a la apelada en agosto de 1997 por el Dr. Barnes. Para la fecha de los hechos, la apelada estaba embarazada. El Dr. Barnés había programado una operación de cesárea para el 26 de agosto de 1997. Dos días antes de esa fecha, la criatura, que era hembra, falleció en el vientre de la madre.

La parte apelada plantea que el apelante fue negligente al no adelantar la fecha de la operación cesárea. En particular, la apelada alega que ella había acudido al Hospital Damas en la noche del 20 agosto de 1997 con síntomas de parto. A la apelada se le hizo una prueba de trazado que reflejaba que ella no tenía contracciones y que la criatura estaba bien, por lo que el apelante ordenó por la vía telefónica que se le diera de alta y se le entregara el resultado de la prueba para que la apelada lo visitara al día siguiente. La apelada no siguió estas instrucciones.

Mediante la sentencia apelada, el Tribunal de Primera Instancia declaró con lugar la demanda y condenó a los apelantes a pagar solidariamente a los apelados la suma de $310,000 más una condena de $20,000 por concepto de honorarios de abogado, por su temeridad.

Revocamos.

## II

El apelante Ricardo Barnés es doctor en medicina con especialidad en obstetricia y ginecología. Para la fecha de los hechos, el apelante practicaba su especialidad en Ponce. El apelante mantenía una sociedad profesional bajo el nombre de Instituto Gineco-obstétrico, con el también especialista en obstetricia y ginecología Dr. Carlos Rivera Pérez. El apelante realizaba sus partos y operaciones en el Hospital Damas, en el cual tenía privilegios para atender a sus pacientes privados.

Para este período, American era la compañía aseguradora de Hospital Damas.

Los apelados están casados y para la fecha de los hechos, residían en Adjuntas. Durante su matrimonio habían procreado dos hijos varones, los cuales habían nacido mediante sendas operaciones cesáreas. El apelante había atendido a la apelada durante su segundo embarazo y había ejecutado su operación cesárea.

A principios de 1997, la apelada quedó embarazada por tercera ocasión. Los apelados acudieron nuevamente donde el apelante y el Dr. Rivera Pérez para que atendieran a la apelada.

El apelante y su socio comenzaron a tratar a la apelada desde enero de 1997. A la apelada se le practicaron los exámenes pertinentes para determinar su fecha de parto y se programó un curso de seguimiento. Durante el cuidado prenatal, la apelada acudió a las oficinas del apelante en 16 ocasiones.

Eventualmente, los médicos determinaron que a la apelante se le practicaría una cesárea. La prueba presentada durante el juicio tendió a reflejar que la mejor práctica en estos casos es que la operación de cesárea se realice cerca del parto. Cuando una paciente no está de parto, la pared muscular del útero es mucho más ancha, por lo que resulta más difícil llegar a ella y la paciente sangra más durante la intervención quirúrgica. Una vez se inicia el proceso de dilatación, el tejido de la matriz se va poniendo más fino, lo que hace más fácil realizar la incisión.

En el caso de la apelada, los doctores determinaron que su fecha de parto sería alrededor del 26 de agosto de 1997. La operación de cesárea fue programada para esa fecha.

La apelada no presentaba factores de riesgo. No padecía de alta presión, de diabetes, ni de otra condición que sugiriera la presencia de complicaciones. Conforme a la prueba desfilada, el hecho de que la apelada había

tenido dos cesáreas anteriores no constituia un factor de riesgo adicional para su parto.

La última cita pre-natal de la apelada lo fue el 18 de agosto de 1997. ■ En esa ocasión, la apelada compareció a la oficina del apelante quejándose de que tenía dolores que podían ser contracciones.

Según la prueba desfilada durante el juicio, el proceso de parto tiene varias etapas. Se inicia con un proceso de contracciones uterinas, marcadas por la elevación y bajada de la presión intrauterina. Estas contracciones comienzan a mover la criatura hacia abajo. En esta primera etapa, todavía no ocurre dilatación de la matriz.

En la segunda etapa, la cabeza del bebé baja y comienza a dilatar el cuello de la matriz. La dilatación del cuello de la matriz se mide en una escala de cero a diez. La dilatación es cero cuando no se ha comenzado a dilatar el cuello, y de diez, cuando la dilatación ya es completa.

En la primera etapa del parto, o podromo del parto, la paciente siente contracciones que son fuertes, pero que todavía no están ocasionando la dilatación del cuello de la matriz. Luego comienza la dilatación que puede producirse más o menos lentamente al principio. Se entiende que el parto es activo cuando la dilatación ha alcanzado los 4 centímetros y las contracciones son regulares.

El cuello de la matriz usualmente mide aproximadamente 2 centímetros de largo. Cuando comienza la dilatación, la presión ocasionada por el bebé ocasiona que el cuello se borre. El proceso es irreversible. Cuando el cuello de la matriz comienza a dilatarse, el bebé no retrocede. Cuando el parto es activo, luego de los 4 centímetros, este proceso es rápido.

El 18 de agosto de 1997, la apelada fue examinada por el Dr. Carlos Rivera Pérez, quien determinó que aún no estaba de parto. En dicha ocasión, se le entregó copia de su récord médico prenatal y otros documentos adicionales para que compareciera al Hospital Damas a tramitar su preadmisión para el próximo 26 de agosto, fecha en que se había programado su cesárea.

El 19 de agosto, la apelada compareció al Hospital Damas y efectuó los trámites necesarios para su preadmisión.

Al día siguiente, 20 de agosto de 1997, en horas de la noche, la apelada comenzó a sentir fuertes dolores abdominales que la apelada estimaba podían ser contracciones de parto. La apelada pensó que su alumbramiento podía ser eminente y compareció junto a su esposo a la Sala de Emergencia del Hospital Damas. La apelada explicó que ella era paciente del apelante.

Dadas las explicaciones ofrecidas por la apelada, el personal de la Sala de Emergencias se comunicó con la Sala de Anteparto del Hospital para que la buscaran y subieran a dicha Sala.

Una vez conducida a la Sala de Antepartos, la apelada le pidió a las enfermeras allí presentes que llamaran a sus médicos de cabecera, ya que estaba en su noveno mes de embarazo, a sólo seis días de la fecha para la cual se había programado su operación cesárea, y entendía que tenía contracciones fuertes y seguidas.

La apelada fue atendida por la enfermera Amalia Galarza Franco de la Sala de Parto. Dicha enfermera procedió a colocarle a la apelada un monitor externo para realizar una prueba de trazado fetal. ■

Según la explicación ofrecida durante el juicio, se trata de una prueba objetiva que mide la fuerza de las contracciones y que permite determinar si éstas son contracciones de parto o no. Durante el tercer trimestre de embarazo, existen contracciones falsas o *"Braxton Hicks"* que, aunque están asociadas a la contracción de la matriz y pueden ser sentidas por la paciente, no implican un proceso de parto.

La prueba también evalúa el bienestar del feto, los latidos cardíacos fetales, la reacción a esos latidos y el movimiento del bebé. ▮ Si el bebé no corre peligro, se entiende que la prueba resultó ser un "*non stress test*." Como en toda prueba, hay un margen de error en dicha apreciación, pero este margen es bajo, menos de 1%.

Normalmente, este tipo de prueba se repite sobre una base semanal, lo que implica que cuando se obtiene un resultado positivo ("*non stress test*"), de ordinario no se anticipan cambios por varios días.

Si el trazado arroja la presencia de contracciones, la prueba resulta ser un "*contraction stress test*" y sugiere que la paciente puede estar de parto. Las contracciones también pueden ser inducidas suministrando oxitocina a la paciente. La prueba, en ese caso, se denomina un "*oxitin challenge test*."

En el caso de la apelada, el resultado de su trazado fue un "*non stress test*", lo que indicaba que la apelada no estaba de parto.

La enfermera Galarza se comunicó por la vía telefónica con el Dr. Barnés y le transmitió los resultados apreciados por ella del trazado. El apelante impartió órdenes a la enfermera que la apelada podía regresar a su casa y que lo viera al próximo día y le llevara el trazado o gráfica producida por el monitor. ▮

La apelada fue dada de alta alrededor de la 1:00 a.m. del 21 de agosto de 1997. Durante su visita al Hospital esa noche, la apelada no fue examinada por ningún médico, ni se le tomaron signos vitales. Como no fue admitida al Hospital, no se preparó récord alguno. El apelante no examinó personalmente a la apelada, sino que descansó en la información que le proveyó la enfermera Galarza por la vía telefónica. El Hospital Damas no conservó copia del trazado realizado. La única indicación del trámite seguido lo fue una anotación de la enfermera Galarza en la bitácora o "*Log-Book*" del Hospital que expresaba que se había realizado una prueba de trazado fetal y que "*[s]e notifica al Dr. Barnes y se orienta a [paciente] sobre cita médica al día siguiente.*"

El procedimiento seguido fue consistente con la práctica del Hospital en cuanto a pacientes parturientas. [5] Las Reglas del Departamento de Obstetricia de la institución, sin embargo, requerían que cuando se realizara un trazado mediante el monitor fetal externo, los resultados de la prueba se unieran al récord del paciente. ("*All tracings will become part of the clinical records. If this is not possible, representative portions of the tracing will be made part of the records*").

Contrario a las instrucciones del apelante, la apelada no compareció a la oficina de sus médicos el 22 de agosto de 1997 ni en los días siguientes.

El 24 de agosto de 1997, la apelada comenzó a sangrar vaginalmente. Ante dicho cambio, la apelada compareció nuevamente a la Sala de Emergencias del Hospital Damas. Allí la volvieron a subir a la Sala de Anteparto y le colocaron el monitor fetal externo. Esta vez, sin embargo, no se detectaron latidos fetales. Las enfermeras le informaron a la apelada que su bebé estaba muerta.

A la apelada se le realizó un sonograma, el que confirmó que la criatura había fallecido. La apelada fue examinada por el Dr. Barnés, quien confirmó que nunca había comenzado a dilatar. El apelante le suministró un medicamento a la apelada para inducir el parto de feto por la vía vaginal.

Al otro día, a las diez de la mañana, el apelante le administró por segunda vez dicho medicamento a la apelada. A las tres de la tarde de ese día, 25 de agosto de 1997, la apelada fue examinada por el Dr. Rivera Pérez.

El proceso de inducción y el parto continuó durante todo el resto del día 25. Finalmente, 26 de agosto de 1997, la apelada dio a luz. En ese momento, no estaba presente ningún médico, sino que la atendieron las

enfermeras. La bebé nació natimuerta. Durante el parto, el cadáver de la bebé fue colocado en una bandeja, junto con la placenta de la apelada, a la vista de ésta, mientras se la atendía.

A la criatura le fue efectuada una autopsia. Se determinó que había fallecido debido a una anoxia intrauterina. La autopsia reflejó que había meconio en la placenta, lo que sugiere que el bebé padeció "*fetal distress*".

Aunque se desconoce la causa precisa de la muerte, la prueba desfilada durante el juicio reflejó que un número significativo de los bebés nacen muertos. Esto ocurre aproximadamente en 10 de cada 1,000 partos. La causa más frecuente de estas fatalidades es un accidente con el cordón umbilical o problemas con la placenta de la madre. Este tipo de accidente no se puede predecir.

En el caso de autos, la prueba pericial tendió a establecer que la muerte de la bebé ocurrió alrededor de cuarenta y ocho horas antes del parto, es decir, entre el 23 y 24 de agosto de 1997.

La parte apelada se afectó mucho por la muerte de su bebé. ■

En agosto de 1998, la parte apelada instó la presente demanda por daños y perjuicios por mala práctica de la medicina contra el apelante y su socio el Dr. Rivera Pérez, así contra sus esposas y respectivas sociedades de bienes gananciales, el Hospital Damas, American y otras partes.

En su demanda, la parte apelada alegó que los demandados habían actuado de forma negligente al no ordenar que permaneciera hospitalizada y realizar su cesárea el 21 de agosto de 1997, lo que había provocado que su bebé falleciera. La parte apelada negó que al ser dada de alta esa fecha, se le hubiera instruido que al otro día compareciera a la oficina del apelante o que se le hubiera dado la gráfica de la prueba del trazado fetal. La parte apelada alegó que el Hospital Damas también era responsable, por su omisión de mantener un récord médico apropiado para la apelada.

Los demandados contestaron separadamente la demanda y negaron las alegaciones.

Luego de otros incidentes, se celebró la vista en su fondo del caso.

Durante la vista, la apelada Rosario López declaró a su favor. La apelada insistió en que al ser dada de alta el 21 de agosto de 1997, no se le había entregado la gráfica de su trazado fetal ni se le había instruido a que debía ir al día siguiente a la oficina del Dr. Barnés, según lo refiere la bitácora del Hospital.

En ese momento, los apelantes solicitaron que se citara al nuevo ginecólogo de la apelada, Dr. Héctor René Aponte, como testigo de impugnación. De acuerdo a la oferta de prueba realizada por los apelantes, dicho testigo hubiera declarado que la apelada tenía en su poder el original de la gráfica del trazado fetal que se le había realizado el 21 de agosto de 1997 y se lo había llevado a dicho galeno para que lo examinara.

Ante dicha oferta, la parte apelada cambió su versión y acordó estipular que, al abandonar el hospital el día en cuestión, se le había entregado la gráfica del trazado fetal y se le habían dado instrucciones de que la llevara al día siguiente a la oficina del apelante.

Las partes estipularon el testimonio del apelado José Santos Días sobre los daños sufridos por él como consecuencia de la muerte de su hija.

Los apelados también presentaron el testimonio pericial del Dr. Rafael Marcano Marcano. Dicho perito declaró que tenía 42 años de experiencia en su profesión. Expresó que él entendía que el apelante Dr. Barnes

había actuado negligentemente en la noche del 20 de agosto de 1997 y la madrugada del 21 de agosto de 1997, al no comparecer al Hospital para examinar personalmente a la apelada. El Dr. Marcano opinó que era importante que el apelante realizara un examen pélvico a la apelada, para confirmar si estaba de parto y que la mantuviera hospitalizada bajo observación. Señaló que el Hospital venía obligado a mantener un récord apropiado para la paciente y que, en ausencia de lo anterior, no podía determinarse si la evaluación de la enfermera Galarza había sido correcta.

La opinión del Dr. Marcano fue controvertida por la Dra. Josefina Romaguera, catedrática en obstetricia y ginecología de la Escuela de Medicina de la Universidad de Puerto Rico, quien opinó que la parte apelante había actuado conforme a las normas aceptadas de la medicina en el caso. La Dra. Romaguera señaló que no entendía que hubiera relación entre la decisión del apelante de no hospitalizar a la apelada el 21 de agosto de 1997 y la muerte de su bebé, la que ocurrió varios días después.

La Dra. Romaguera señaló que el apelante había actuado correctamente al no retener a la apelada en el hospital, ya que ésta no estaba de parto activo y nunca había llegado a estarlo previo a la muerte del bebé. Dicha perito señaló que, conforme al examen de trazado fetal, la criatura estaba bien en ese momento. Aclaró que no era necesario que se realizara un examen pélvico a la apelada cada vez que fuese atendida, porque ello podía aumentar su riesgo de infección.

Los apelantes también presentaron el testimonio de la enfermera Galarza, quien declaró sobre su intervención con la apelada durante la noche del 20 de agosto de 1997 y la madrugada del 21 de agosto de 1997.

Las partes presentaron evidencia documental. Los apelados, sin embargo, nunca presentaron la gráfica del trazado fetal tomado a la apelada y que, según se estipuló durante el juicio, fue entregado a ésta por la enfermera Galarza.

Al cierre de la prueba, los apelados solicitaron desistir de su reclamación contra el Dr. Rivera. El Tribunal de Primera Instancia emitió la correspondiente sentencia parcial.

El 11 de febrero de 2005, a base de la prueba desfilada, el Tribunal de Primera Instancia emitió la sentencia apelada y declaró con lugar la demanda contra los apelantes.

En su sentencia, el Tribunal de Primera Instancia concluyó que el apelante había actuado con negligencia al no ordenar, cuando la apelada compareció al Hospital en la noche del 20 de agosto de 1997, que ésta permaneciera hospitalizada y no adelantar su operación de cesárea.

El Tribunal expresó:

*"Lo cierto es que esa noche, la criatura estaba viva y ante el malestar de la Sra. López, lo más probable es que hubiese nacido con vida si su obstetra le hubiese examinado personalmente y brindado el tratamiento adecuado, incluyendo una operación de cesárea antes de la fecha señalada del 26 de agosto, de haber sido necesario o al menos dejarla bajo observación para ver su progreso. Considerando que la Sra. López acudió a la sala de emergencias del hospital codemandado 5 días antes de la fecha en que se le practicaría la cesárea, no hubiese sido irrazonable que el médico adelantara la fecha."*

Más adelante, el Tribunal también expresó:

*"Concluimos, ..., que aun cuando la codemandante no estuviera efectivamente de parto la noche del 20 de agosto, como lo determina la perito de la parte demandada, aún así sus circunstancias particulares de dos (2) operaciones cesáreas previas y la inminencia de una tercera, la proximidad a la fecha estimada, pero*

*imprecisa del parto mediante operación cesárea del 26 de agosto y las quejas recurrentes de ésta, ameritaban y requerían que esa noche o al día siguiente su obstetra le practicara un examen pélvico para que con sus resultados y la información previa recopilada por la enfermera desde la noche anterior, estuviese en posición de tomar la decisión informada de adelantar la ejecución de la operación cesárea, lo que hubiera evitado la muerte de la bebé de la demandante."*

El Tribunal concluyó que el Hospital Damas había actuado de manera negligente y que *"debió de ordenar a un médico de su institución que ... examinara [a la apelada] y determinara si era necesario mantenerla ingresada."* El Tribunal entendió que el Hospital también fue negligente *"al no abrir un récord médico de la visita de la codemandante, aun cuando las reglas escritas del propio hospital lo requerían".*

El Tribunal expresó:

*"La omisión del Hospital Damas constituye negligencia per se. Ante la ausencia del récord médico, este Tribunal nunca estuvo en la posición de determinar, a base del testimonio de los peritos de las partes, si en efecto, el examen que le practicaron las enfermeras a la Sra. López fue efectuado adecuadamente y si las impresiones de los resultados que le relataron al Dr. Barnés por teléfono fueron adecuadas y correctas."*

El Tribunal también indicó:

*"Si la laxitud en el mantenimiento del récord médico mengua su efectividad como instrumento útil, cuando no existe el récord médico obviamente no contamos con instrumento alguno que sirva de referencia para evaluar el tratamiento y cuidado brindado al paciente. Dicha omisión, crasa en estos tiempos en donde se ha cobrado conciencia de las implicaciones médico-legales de los récords médicos, constituye negligencia."*

El Tribunal declaró con lugar la demanda y condenó solidariamente a las partes apelantes a pagar a la apelada $220,000 por sus daños y angustias mentales por la pérdida de su bebé y al apelado $90,000, por el mismo concepto, para una compensación total de $310,000.

El Tribunal concluyó que los apelantes habían actuado con temeridad al defenderse del litigio y les impuso además una condena de $20,000, por concepto de honorarios de abogado.

Las partes apeladas solicitaron determinaciones adicionales de hechos, solicitud que fue denegada por el Tribunal de Primera Instancia.

Insatisfechos, Hospital Damas, el Dr. Barnés y American comparecieron separadamente ante este Tribunal.

Mediante resolución emitida el 8 de junio de 2005, ordenamos la consolidación de los recursos.

### III

En sus escritos, las partes apelantes plantean que el Tribunal de Primera Instancia erró al declarar con lugar la demanda e imponerles responsabilidad en el presente caso. Los apelantes alegan que el Tribunal actuó incorrectamente al no imputar negligencia comparada a la apelada, por su omisión de acudir a la oficina del apelante, según se le había instruido. También plantean que el Tribunal abusó de su discreción al imponerles honorarios de abogado por temeridad.

Según se conoce, en nuestra jurisdicción, la responsabilidad civil resultante de actos u omisiones culposas o negligentes está regida por el Artículo 1802 del Código Civil, 31 L.P.R.A. sec. 5141. Dicho precepto establece que el que por acción u omisión cause daño a otro, mediante culpa o negligencia, viene obligado a reparar el daño causado. El artículo añade que la imprudencia concurrente del perjudicado no exime de responsabilidad,

pero conlleva la reducción de la indemnización.

El Tribunal Supremo de Puerto Rico ha aclarado que para que exista responsabilidad bajo dicho precepto, es necesario que concurran los siguientes elementos: (1) un daño, (2) una acción u omisión negligente, y (3) la relación causal entre el daño y la conducta culposa o negligente. *Montalvo v. Cruz*, 144 D.P.R. 748, 755 (1998); *Toro Aponte v. E.L.A.,* 142 D.P.R. 464, 473 (1997); *Elba A.B.M. v. U.P.R.,* 125 D.P.R. 294, 308 (1990).

La culpa o negligencia consiste en la omisión de aquella diligencia que exija la naturaleza de la obligación, correspondiendo tal diligencia a las circunstancias de las personas, del tiempo y del lugar. La diligencia exigible en estos casos es la que correspondería ejercitar a un buen padre de familia o un hombre prudente y razonable. *Toro Aponte v. E.L.A.,* 142 D.P.R. a la pág. 473; *Elba A.B.M. v. U.P.R.,* 125 D.P.R. a la pág. 309.

No se responde, sin embargo, por acontecimientos que no son razonablemente previsibles, es decir, por sucesos fortuitos. *Toro Aponte v. E.L.A.,* 142 D.P.R. a la pág. 473.

Para determinar si una omisión es generadora de responsabilidad, se considera: (1) la existencia o inexistencia de un deber jurídico de actuar por parte del alegado causante del daño, y (2) si de haberse llevado a cabo el acto omitido, el daño se hubiera evitado. *Toro Aponte v. E.L.A.,* 142 D.P.R. a la pág. 474.

En nuestro ordenamiento rige la teoría de causalidad adecuada para determinar responsabilidad por los daños bajo el citado Artículo 1802. Según dicha doctrina, *"no es causa toda condición sin la cual no se hubiera producido el resultado, sino la que ordinariamente lo produce según la experiencia general"*. *Montalvo v. Cruz*, 144 D.P.R. a la pág. 756; *Soc. de Gananciales v. Jerónimo Corp.,* 103 D.P.R. 127, 134 (1974).

Si el daño se debe a la conducta de más de una persona, todos responden como cocausantes del daño. Dichos cocausantes son responsables solidariamente frente al perjudicado, sin perjuicio de que en la relación interna entre ellos la obligación se divida de acuerdo a la proporción en que la culpa o negligencia de cada uno contribuyó a la ocurrencia del daño. *Torres Ortiz v. E.L.A.,* 136 D.P.R. 556, 564-565 (1994); *Sánchez Rodríguez v. López Jiménez,* 118 D.P.R. 701, 705-706 n. 2 (1987); *Ramos v. Caparra Dairy, Inc.,* 116 D.P.R. 60, 62-64 (1985).

En cuanto el grado de diligencia que deben observar los profesionales de la salud, el Tribunal Supremo ha establecido que los mismos están obligados a seguir las normas mínimas de cuidado, conocimiento y destrezas del *"profesional razonable"*. El contenido de esta obligación queda delimitado conforme al estado de conocimiento y práctica prevaleciente, que satisface las exigencias generalmente reconocidas por la referida profesión, a la luz de los modernos medios de comunicación y enseñanza. *Arrieta v. De la Vega,* 165 D.P.R. ___ (2005), **2005 J.T.S. 134**, a la pág. 168; *López y otros v. Dr. Cañizares,* 163 D.P.R. ___ (2004), **2004 J.T.S. 165**, a la pág. 298; *Castro Ortiz v. Mun de Carolina,* 134 D.P.R. 783, 793 (1994); *Medina Santiago v. Vélez,* 120 D.P.R. 380, 384-385 (1988); *Zambrana v. Hospital Santo Asilo de Damas,* 109 D.P.R. 517, 522 (1980); *Oliveros v. Abréu,* 101 D.P.R. 209, 226 (1973); véase, además, *Colón Prieto v. Géigel,* 115 D.P.R. 232, 239-240 (1984).

Para prevalecer en un caso contra un profesional de la salud, el demandante viene obligado a: (1) presentar prueba sobre las normas mínimas de conocimiento y cuidado aplicables al área en cuestión, (2) demostrar que el demandado incumplió con estas normas en el tratamiento del paciente, y (3) que esto fue la causa del daño sufrido por el paciente. Véanse, *Blás v. Hosp. Guadalupe,* 146 D.P.R. 267, 322 (1998); *Santiago Otero v. Méndez,* 135 D.P.R. 540, 549 (1994); *Rodríguez Crespo v. Hernández,* 121 D.P.R. 639, 650 (1988); *Medina Santiago v. Vélez,* 120 D.P.R. 380, 385 (1988); *Matos v. Adm. Serv. Médicos de P.R.,* 118 D.P.R. 567, 569 (1987).

Existe una presunción de que un profesional de la salud ha observado un grado razonable de cuidado y atención en la administración de tratamiento y que los exámenes practicados al paciente han sido adecuados. *Arrieta v. De la Vega*, 2005 J.T.S. 134, a la pág. 169; *López y otros v. Dr. Cañizares*, 2004 J.T.S. 165, a la pág. 298; *Blás v. Hosp. Guadalupe*, 146 D.P.R. a la pág. 322; *Rodríguez Crespo v. Hernández*, 121 D.P.R. a la pág. 650.

El hecho de que un paciente haya sufrido un daño o que el tratamiento no haya tenido éxito es insuficiente, de por sí, para derrotar dicha presunción. Corresponde a la parte demandante controvertirla con prueba que demuestre algo más que la mera posibilidad de que el daño se debió al incumplimiento por parte del demandado de su obligación profesional. *Arrieta v. De la Vega*, 2005 J.T.S. 134, a la pág. 169; *López y otros v. Dr. Cañizares*, 2004 J.T.S. 165, a la pág. 298; *Blás v. Hosp. Guadalupe*, 146 D.P.R. a la pág. 322; *Ramos, Escobales v. García, González*, 134 D.P.R. 969, 976 (1993); *Rodríguez Crespo v. Hernández*, 121 D.P.R. a la pág. 650.

La relación de causalidad no puede establecerse a base de meras especulaciones o conjeturas, sino que, al igual que en todo caso civil, por preponderancia de la prueba. Si la evidencia señala a la existencia de múltiples causas del daño, no puede imponérsele responsabilidad al profesional de la salud a menos que del conjunto de la evidencia surja que con mayor probabilidad la actuación negligente fue la causa del daño. Véanse, *Blás v. Hosp. Guadalupe*, 146 D.P.R. a la pág. 322; *Ramos, Escobales v. García, González*, a la pág. 976; *Rodríguez Crespo v. Hernández*, 121 D.P.R. a la pág. 650; *Vda. de López v. E.L.A.*, 104 D.P.R. 178, 183 (1975).

A los médicos y otros profesionales de la salud se les reconoce una amplia discreción profesional en su trabajo. No existe responsabilidad por impericia cuando el demandado se enfrenta a una situación en la cual cabe una duda educada y razonable sobre el curso de tratamiento a seguir. El error de juicio es oponible como defensa siempre y cuando el profesional de la salud hubiese efectuado esfuerzos razonables para enterarse y cerciorarse de los síntomas y de la condición del paciente, se han agotado los medios de diagnóstico a su disposición y cuando las autoridades están divididas sobre el curso a seguir. *Arrieta v. De la Vega*, 2005 J.T.S. 134, a la pág. 169; *López y otros v. Dr. Cañizares*, 2004 J.T.S. 165, a la pág. 298; *Santiago Otero v. Méndez*, 135 D.P.R. a las págs. 549-550; *Ramos, Escobales v. García, González*, 134 D.P.R. a la pág. 975; *Lozada v. E. L.A.*, 116 D.P.R. 202, 217 (1985); *Cruz v. Centro Médico de P.R.*, 113 D.P.R. 719, 729-730 (1983); *Oliveros v. Abréu*, 101 D.P.R. a la pág. 228; véase, además, *Blás v. Hosp. Guadalupe*, 146 D.P.R. a la pág. 296.

Un paciente también incurre en negligencia comparada cuando omite acudir a una facilidad médica, cuando ello resulta necesario. Véanse, *Flores Ramírez v. Maldonado*, 138 D.P.R. 722, 729 (1995); *Castro Ortiz v. Mun. de Carolina*, 134 D.P.R. a la pág. 795.

En cuanto a la responsabilidad que tienen los hospitales respecto a sus pacientes, la norma es que dichas instituciones le deben a sus pacientes aquel grado de cuidado que ejercería un hombre prudente y razonable en condiciones y circunstancias similares. *López y otros v. Dr. Cañizares*, 2004 J.T.S. 165, a la pág. 298; *Blas v. Hosp. Guadalupe*, 146 D.P.R. a la pág. 323; *Márquez Vega v. Martínez Rosado*, 116 D.P.R. 397, 405 (1985); *Núñez v. Cintrón*, 115 D.P.R. 598, 613 (1984); *Crespo v. H.R. Psychiatric Hosp.*, 114 D.P.R. 796, 800 (1983); *Hernández v. La Capital*, 81 D.P.R. 1031, 1037-38 (1970).

El Tribunal Supremo de Puerto Rico ha resuelto, sin embargo, que cuando se trata de un tratamiento electivo ofrecido por un médico que no es, como tal, empleado del hospital, sino que goza de privilegios para atender allí a sus pacientes, el hospital, como regla general, no responde vicariamente por la negligencia del médico. *Márquez Vega v. Martínez Rosado*, 116 D.P.R. a las págs. 408-409.

En estos casos se entiende que "*la relación principal que se establece es entre el paciente y el médico, siendo de carácter suplementaria e incidental aquélla que se crea entre el paciente y el hospital*". *Márquez*

*Vega v. Martínez Rosado*, 116 D.P.R. a la pág. 409.

La falta de anotaciones en un récord médico no constituye negligencia per se. No obstante, esta omisión puede ser un factor a considerarse en la credibilidad que se confiera al médico respecto al tratamiento brindado al paciente. *Pérez Cruz v. Hosp. La Concepción*, 115 D.P.R. 721, 732 (1984); *Reyes v. Phoenix Assurance Co.*, 100 D.P.R. 871, 880 (1972). La clase médica puede protegerse contra pleitos injustificados con un récord médico completo y adecuado. *Reyes v. Phoenix Assurance Co.*, 100 D.P.R. a la pág. 880.

De ordinario, lo que constituye o no una práctica profesional adecuada en un caso de impericia debe ser establecido mediante testimonio pericial. Véanse, *Ríos Ruiz v. Mark*, 119 D.P.R. 816, 828-829 (1987); *Reyes v. Phoenix Assurance Co.*, 100 D.P.R. a la pág. 877; *Guzmán v. Silén*, 86 D.P.R. 532, 538 (1962).

En la evaluación de este tipo de prueba, el tribunal apelativo está en la misma posición que el juzgador de primera instancia para arribar a sus propias conclusiones. *Arrieta v. De la Vega*, **2005 J.T.S. 134**, a la pág. 169; *Ramos, Escobales v. García, González*, 134 D.P.R. a la pág. 976; *Ríos Ruiz v. Mark*, 119 D.P.R. a la pág. 820; *Cruz v. Centro Médico de P.R.*, 113 D.P.R. a la pág. 721; véase, además, *Culebra Enterprises Corp. v. E.L.A.*, 143 D.P.R. 935, 952 (1997).

En la situación de autos, según hemos visto, el Tribunal de Primera Instancia determinó que el Dr. Barnés había incurrido en negligencia al no ordenar que la apelada permaneciera hospitalizada durante la madrugada del 21 de agosto de 1997 y al no adelantar la fecha de la operación cesárea. Esta determinación no está sostenida por la prueba.

Lo cierto es que el récord reflejó que la apelante no estaba de parto esa noche. Ello fue establecido por el testimonio de la enfermera Galarza, quien le realizó una prueba de trazado fetal. El resultado de la prueba reflejó que el feto estaba bien y que la apelada no tenía contracciones de parto. Más importante aún, la apelada **no** había comenzado a dilatar cuando regresó al hospital y fue examinada el 24 de agosto de 1997. Si la apelada no estaba de parto en este momento, no podía haberlo estado cuatro días antes, cuando acudió a la Sala de Emergencia del Hospital Damas. ■

La prueba reflejó que se recomienda pautar una operación cesárea cerca del parto, porque en ese momento el tejido muscular de la matriz es menos grueso, lo que hace más fácil y menos riesgosa la operación. Toda vez que la apelada no tenía contracciones de parto el 20 de agosto de 1997, no puede considerarse que el Dr. Barnés hubiera incurrido en negligencia al no adelantar la operación.

En el presente caso, los médicos de la apelada habían estimado que ésta habría de estar de parto para el 26 de agosto de 1997. No se presentó evidencia alguna para cuestionar dicha apreciación. A base de ella, la decisión de programar la operación para esa fecha fue razonable.

En su sentencia, el Tribunal de Primera Instancia hizo hincapié en que el Hospital Damas no abrió un récord médico para la apelada ni procuró que ésta fuese examinada por uno de los facultativos del hospital. La apelada, sin embargo, era paciente privada del Dr. Barnés, quien fue consultado por las enfermeras y quien dio instrucciones sobre el procedimiento a seguir.

Resulta improcedente, en este sentido, imponer responsabilidad vicaria al Hospital Damas por las actuaciones del Dr. Barnés. *Márquez Vega v. Martínez Rosado*, 116 D.P.R. a la pág. 408-409.

El Hospital no abrió un récord médico formal a la apelada porque ésta no fue finalmente admitida a la institución. La mera omisión del Hospital Damas de llevar a cabo lo anterior, no justifica la imposición de responsabilidad contra dicha parte, en ausencia de otras actuaciones de negligencia. *Pérez Cruz v. Hosp. La*

*Concepción*, 115 D.P.R. a la pág. 732; *Reyes v. Phoenix Assurance Co.,* 100 D.P.R. a la pág. 880.

El testimonio de la enfermera Galarza, en este sentido, fue que ella realizó una prueba de trazado fetal a la apelada, por instrucciones del Dr. Barnés, y que el resultado fue el de un *"non stress test,"* lo que indicaba que la apelada no estaba de parto y que el feto estaba bien.

El Tribunal de Primera Instancia entendió que dicho testimonio debía de ser tomado con cautela, porque la apelada no había sido directamente examinada por un médico y porque la gráfica del trazado no fue unida al récord de la apelada, según lo requerían las reglas de la institución.

Lo cierto es que la prueba reflejó que la enfermera Galarza era una enfermera debidamente entrenada, que llevaba 14 meses trabajando en la Sala de Parto del Hospital Damas y que realizaba este tipo de prueba de forma consuetudinaria. Las partes estipularon que la enfermera Galarza le entregó la gráfica del trazado a la apelada para que ésta la llevara a la oficina del Dr. Barnés al otro día.

La apelada tenía en su poder este récord, el que permitía corroborar el testimonio de la enfermera Galarza. La parte apelada, sin embargo, optó por no presentarlo. Debe inferirse, en estas circunstancias, que dicha prueba no le era favorable. Véase, la Regla 16, incisos (5) y (6), de las de Evidencia, 32 L.P.R.A. Ap. IV, R. 16.

Según se indicara anteriormente, durante la mayor parte del procedimiento, la apelada insistió que la enfermera Galarza no le había entregado la gráfica del trazado fetal y que no le había instruido acudir a la oficina del Dr. Barnés. No fue sino hasta que la parte apelante solicitó que se citara al nuevo ginecólogo de la apelada, quien hubiera declarado que ella le había mostrado la gráfica, que la apelada desistió de su versión y acordó estipular que la prueba le había sido entregada y que se le había orientado sobre el extremo anterior.

Nos parece irrazonable, en estas circunstancias, concluir, como lo hizo el Tribunal de Primera Instancia, que el testimonio de la enfermera Galarza debía ser tomado con reservas, porque no se había presentado el resultado de la prueba.

La evidencia tendió a reflejar que la criatura estaba bien para la madrugada del 21 de agosto de 1997 y que la apelada no estaba de parto en este momento.

El feto falleció dos días después de esto. Hasta donde el récord permite determinar, su fallecimiento no era predecible. Al día de hoy, se desconoce precisamente cuál fue la causa precisa de la muerte aunque cabe especular que pudo haber sido un accidente con el cordón umbilical o un problema con la placenta. No puede atribuirse dicho resultado a una actuación negligente alguna de los apelantes.

Reconocemos que si se hubiera llevado a cabo la operación de cesárea el 21 de agosto de 1997, la criatura tal vez se pudo haber salvado. Pero ello no implica que la parte apelante fue negligente al no adelantar la intervención.

El examen de trazado fetal llevado a cabo durante la noche del 20 y la madrugada del 21 de agosto de 1997 reflejó que el feto estaba bien en ese momento. La apelada recibió instrucciones de acudir al día siguiente a la oficina del Dr. Barnés y de llevarle la gráfica del trazado, lo que la apelada no hizo. Aun si se pudiera entender que medió alguna negligencia por parte del Dr. Barnés en el tratamiento de la apelada, lo que hemos rechazado, habríamos de concluir que la omisión de la apelada de acudir a la oficina del médico constituyó negligencia comparada de su parte, y que dicho factor constituyó en igual o mayor medida que la actuación de los apelantes, a los daños de los apelantes. Cf., *Flores Ramírez v. Maldonado,* 138 D.P.R. a la pág. 729; *Castro Ortiz v. Mun. de Carolina*, 134 D.P.R. a la pág. 795.

Reconocemos que las determinaciones formuladas por el Tribunal de Primera Instancia, de ordinario, merecen deferencia por parte de los foros apelativos. *Argüello v. Argüello*, 155 D.P.R. 62, 78-79 (2001); **2001 J.T.S. 127**, a la pág. 94; *Colón y otros v. K-Mart y otros*, 154 D.P.R. 510, 520 (2001); *Orta v. Padilla*, 137 D.P.R. 927, 937 (1995); *Rodríguez Oyola v. Machado Díaz*, 136 D.P.R. 250, 258 (1994); *Coop. de Seguros Múltiples de P.R. v. Lugo*, 136 D.P.R. 203, 208 (1994).

Pero ello, no implica que la determinación del foro de Primera Instancia goce de credenciales de inmunidad frente la función revisora de este Tribunal. *Rivera Pérez v. Cruz Corchado,* 119 D.P.R. 8, 14 (1987); *Vélez v. Srio. de Justicia*, 115 D.P.R. 533, 545 (1984); *Vda. de Morales v. De Jesús Toro*, 107 D.P.R. 826, 829 (1978).

En el presente caso, somos de la opinión que la sentencia del Tribunal de Primera Instancia no representa el balance más racional, justiciero y jurídico de la evidencia desfilada. *Méndez v. Morales,* 142 D.P.R. 26, 36 (1996); *Abudo Servera v. A.T.P.R.,* 105 D.P.R. 728, 731 (1977).

Al contrario, la evidencia reflejó que la parte apelante no actuó negligentemente al no adelantar la operación de cesárea de la apelada.

Por los fundamentos expresados, se revoca la sentencia apelada. En su lugar, se declara sin lugar la demanda presentada.

Lo pronunció y lo manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones. La Jueza Hernández Torres disiente sin opinión escrita.

Laura M. Vélez Vélez
Secretaria del Tribunal de Apelaciones

## ESCOLIOS 2006 DTA 70

**1.** Para el 2 de agosto de 1997, la apelada tenía contracciones por lo que fue hospitalizada en el Hospital Damas. Fue dada de alta con un diagnóstico de *"false labor"*, ya que aún no estaba de parto.

**2.** Para la fecha de los hechos, la enfermera Galarza llevaba 14 meses trabajando en el Hospital Damas. Según la prueba desfilada, las enfermeras de la Sala de Ante-Parto hacían numerosas pruebas de trazado fetal de forma cotidiana, por lo que la enfermera Galarza tenía experiencia en la lectura de este tipo de prueba.

**3.** Según la explicación ofrecida por la enfermera Galarza, se supone que un feto normal refleje dos movimientos en dos minutos.

**4.** No está claro si el apelante habló con las enfermeras de la Sala de Anteparto por teléfono en más de una ocasión. El apelante alega que las enfermeras primero se comunicaron con él, le informaron de la presencia de la apelada, de los síntomas que ella presentaba y la lectura inicial del monitor. Supuestamente, a base de dicha información, el apelante dio instrucciones que se mantuviese a la apelante acostada sobre el costado izquierdo con el propósito de que el feto recibiese mayor oxigenación y que se continuara con el monitoreo.

Posteriormente, luego de que se hubiera mantenido a la apelada bajo observación por un tiempo, la enfermera Galarza llamó al apelante y le comunicó los resultados de dicho monitoreo. Fue en ese momento que el apelado ordenó que se la diera de alta, se le entregara la gráfica y se le instruyera que fuera a su oficina al otro día.

**5.** Es interesante señalar que en la misma hoja de bitácora en que aparece la anotación de la enfermera Galarza relacionada a la apelada, aparece una nota de otra enfermera de fecha del 18 de agosto de 1997, relacionada a otra paciente que indica *"[e]ntregado trazado y orientada sobre signos de parto."*

**6.** El récord refleja que, con posterioridad a los hechos de este caso, la apelada tuvo un cuarto embarazo. Fue atendida por un nuevo ginecólogo, el Dr. Héctor René Aponte.

**7.** El Tribunal de Primera Instancia consideró que la parte apelante había actuado de manera negligente porque la apelada no fue examinada por ningún médico en la noche del 20 de agosto de 1997 y la madrugada del 21 de agosto de 1997 y no se le realizó un examen pélvico. Dicho examen (que según la prueba desfilada, no necesariamente estaba indicado), sólo podría haber reflejado lo que se encontró cuando la apelada regresó al Hospital el 24 de agosto de 1997, esto es, que la apelada no estaba de parto.